# FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**

TRISTA BROWN, )
)
        Plaintiff, )
)
Vs. )
)
QUEST DIAGNOSTIC, )
)
        Defendant, )

J .N NOV 2 9 2007

NOV 29 2007

Case No.: 07cv952

Judge Der- Yeghiayah

Magistrate Judge Mason

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

<u>Rule 56 B4 Federal Rules Civil Procedure</u>

# Dispositive Motion

On behalf of the plaintiff, (Trista Brown) pro se, I asked honorable

Judge Der- Yeghiayan to grant a judgment and to apply the law without the process for

trial, because the fact had not been an issue, or disclose as an issue after, the discovery;

production of documents and disposition; which were held before the status hearing that

was held on November 7th 2007. There was not any motion of dismissal on any disputed

facts; after or before the status hearing, dated November 7[th 2007] the defendants' counsel,

Laura Kendall. As a matter of fact, soon after the hearing, I, Trista Brown (Plaintiff)

called the lawyer of the defendant (Quest Diagnostic) asking for a settlement on the case,

on or around November 16, 2007 during a telephone conversation. During the telephone

conversation with Laura Kendall, she stated that the settlement demand needed to be in

writing by the plaintiff first and after which the defendant typically makes offer to

plaintiff. On November 20, 2007, the offer was denied. (Exhibit 12) No negotiations

were offered and no settlement was discussed. "I plead the court to consider out line

damages rather than waist the time with an on going trial, I feel a reasonable settlement could be reached if the court could require a settlement discussion, by ordering the 2 parties (defendant, (Quest) and the plaintiff, (Trista Brown)) to attend court mediation. I understand that the lawyer is to defend their client. I am the plaintiff and the (pro se) and held responsible under the same jurisdictions in the court system. If I had legal counsel, (for which I was denied), I feel this case is not with prejudice on behalf of the defendant (Quest Diagnostic) lawyers. I previously stated in my motion to dismiss on 8-15-2007, for sanctions with findings on willing fullness, bad faith or fault was denied (exhibit 11).

Do to all respect, Honorable Judge Der- Yeghianyan, I fell that my denied motion for appointment of counsel though I have proven that I have successfully on the merits of the court and may have the ability to articulate as a pro se and have shown to be successfully indigent, "through my faith and grace by God, by that, same merit, It has been used against me." The defense has taken that merit that I am able to articulate my claim and my inability to find an attorney whom they had copies of my medical history and income status. Even through my discovery and production from the defendant (Quest Diagnostics) of documents (exhibit 9), I had no cooperation and have not given access to certain evidence that should have been entering as dismissal. I had no disclosure of approximately of what is being spent to keep this case hidden from other victims of discrimination (more than 1,000.00 which was the counter offer). The offer of 1,000.00 did not give me any grounds for negotiation.

The court has said that I do not have a right to appoint counsel for indigents in a civil action case, then who rights are they if their not your own. "Who will speak for me, if my rights come with a price tag?" The complexity of this case is not simple. I had no income then and I still have no income now! "Who wins, the one with the most money, who can afford a mass of lawyers or the one with out?" Is the defense viewed differently? Though this not a moral issue but a civil one. I have only this opportunity to plead my case. I only asked and plead that you look at this case, not because I proved to be indigent civil litigant does not have right to appointment counsel, but any case can be complicated. "Quest" seemed to think so; they hired a Jackson and Lewis against, Trista Brown, who can not afford counsel. I respect the court will make a justified decision.

Trista Brown (Pro se)

## CERTIFICATE OF SERVICE

The undersigned, pro se, certifies that on the 28th day of November, 2007, the Dispositive Motion was placed in the U.S. Mail to 320 West Ohio St, Chicago, IL.

Laura K. Kendall

Jackson Lewis LLP

320 W. Ohio St, Suite 500

Chicago, IL 60610

Trista Brown

## Supporting Evidence of Claim

1. Copy of Quest Diagnostic, Defendant, initial motion to dismiss by Laura Kendall, Karen Jefferson, admission to settle under title VII- Discrimination of Disability ( In Good faith).( See Affirmative Defense)

2. Copy of document ADA was perform to eliminate my position, Trista Brown, no medical affirmation from a doctor not which to return with out any restrictions. ( See Affirmative Defenses)

3. Letter of admission sent to plaintiff job restoration.  Document from the EEOC plaintiff had made 3 attempts to return to work before December 13, 2004 after receiving a FMLA entitlement letter from Wendy Gatewood and Denise Patton.

4. Documents from the EEOC, Denise Patton (Supervisor), Lee Burger (Operational Manager), Lemont Moore, Sara Larson agreement to replace position before December 7th.

5. Documents and emails from Wendy Gatewood, Laura Muller's conversation on the date to restoration revised letter sent changing the date to return to work on December 16th.

6. Notarized statement from Venna Sharma (witness in contempt).  (a) written on Aug 18 2007, (b) notarized on August 17 2007 (c) Served on 8-14-07 (subpoena), (d) disposition 8-24-07, (e) notarized letter which states out of country on Aug 24,2008, (f) no show for subpoena, (g) Attention for the defense notified: Wendy Gate wood ( contacted), Shelia Dixon ( Witness for the plaintiff to talk to " Quest " lawyers) tampering with witness.

7. During discovery deposition, Lemont Moore( Business Unit Manager), if he has known about the circumstances before going forward with my job replacement, after giving notice of me coming back to work (I would still have a job).

8. Copy of Punitive Damages ( Affirmative Defense)

9. Initial Discovery of documents was not <u>produced</u> or <u>disclose</u> to plaintiff - # 25 and #28.

10. Status of income in ability to afford counsel.

11. Copy of response to previous motion (denial from the defendant, denial to appoint counsel; grant continuing for consideration due to medical condition.

12. Demand settlement letter.



13. Documents supported that Quest  replaced my position on December 7 , 2004, a certification to return to work was un available because it was Christmas time and my physician was on vacation which was stated several times to Wendy Gatewood ( Human Resources Manager), Denise Patton( Supervisor), and Lemont Moore (Business Unit / Human Resources Manager) before December 16, 2004.

14. No facts in this case shows evidence in my personal file , alleged by the defense, if any committed acts have been know at the time at the Joliet location would have lead to my discharge for cause. ( Affirmative Defense)

15. "Quest" stated that she replace my position with David Wormley because the Joliet Glenwood location was extremely busy, employee were over worked, Quest was over their budget, and floats were used.  David Wormley stayed at the

Jefferson PSC in Joliet less than 3 months, moved to the site in Aurora, and walk out on the job. The Joliet/ Glenwood location was closed due to slow volume. (Review highlighted information.



**ANSWER:**

Quest Diagnostics denies the allegations of paragraph 14.

**WHEREFORE,** the Complaint of Employment Discrimination should be dismissed with prejudice and Quest Diagnostics awarded its costs and any such relief the Court deems just and reasonable.

## AFFIRMATIVE DEFENSES

1.    To the extent Brown purports to assert claims of discrimination under Title VII or the ADA that are not included in the charges of discrimination which she filed with the EEOC, Brown has failed to exhaust her administrative remedies.

2.    On information and belief, Brown committed acts which were unknown to Quest Diagnostics at the time that she was replaced at the Joliet location, and which if known, would have led to discharge for cause. Brown is thereby barred from seeking reinstatement in this action, and is also barred from claiming back pay or benefits after the date Brown's acts were discovered by Quest Diagnostics.

3.    Quest Diagnostics engaged in good faith efforts to comply with Title VII, and therefore cannot be held liable for punitive damages.

4.    To the extent Brown claims discrimination which occurred more than 300 days before she filed her charges of discrimination with the EEOC, such claims are time-barred.

5.    Brown's claims for damages in the form of backpay and benefits are barred by her failure to accept other employment or to otherwise mitigate her damages.

United States District Court, E.D. Michigan, Northern Division.
Ray BORDEAU, Plaintiff,

v.

SAGINAW CONTROL & ENGINEERING, INC., Defendant.
**No. 04-10312-BC.**

Aug. 24, 2006.

### *OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS*

DAVID M. LAWSON, District Judge.

*1 The question presented by this motion is whether the plaintiff may recover under the Family and Medical Leave Act, 29 U.S.C. § 2600 et seq., damages for physical injuries he sustained when he returned to work following an approved medical leave but was placed in a job that required manual labor and therefore was not comparable to the job he left. The Court finds that the FMLA does not extend to such injuries. However, the plaintiff has pleaded damages that are covered under the Act, and therefore his complaint will not be dismissed at this time.

I.

According to the complaint, the plaintiff, Ray Bordeau, was employed by the defendant, Saginaw Control and Engineering Inc., as a purchasing manager since 1975. In January 2003, he requested both medical and family leave from his employer pursuant to the Family and Medical Leave Act to provide care to his elderly mother with a serious health condition and, he alleges, because of his own serious health condition. Compl. at ¶ 10. His request for leave to care for both his mother and himself subsequently was approved, and he was authorized to take leave from January 13, 2003 until April 6, 2003. *Id.* at ¶ ¶ 11-13. After going on leave, the plaintiff noticed that the defendant had begun advertising for his purchasing manager position. *Id.* at ¶ 14. When the plaintiff returned to work on the appointed date, he alleges that he was given a manual labor job on the plant floor and not his previous job as a purchasing manager, or, for that matter not even in the purchasing department at all. *Id.* at ¶ 15. While performing his labor job, the plaintiff sustained a disabling back injury and has not been able to return to work since June 7, 2004, the date of the injury. *Id.* at ¶ 16, 17. The plaintiff's employment was terminated on June 30, 2004.

The plaintiff filed a one-count complaint in this Court on November 17, 2004. The complaint reads, in pertinent part:

### *Count-I Violations of the Family and Medical Leave Act of 1993*

19. By failing to restore Plaintiff to his position in Purchasing, or an 'equivalent position', Defendant violated the FMLA, 29 U.S.C. et seq., including 29 U.S.C Section 2614(a) and the implementing regulations, 29 C.F.R. Section 825.220(b) and (c) (which are promulgated by the Secretary of Labor, 29 U.S.C. Section 2654).

20. As a direct and proximate result of the Defendant's actions, Plaintiff has suffered severe physical injuries, lost wages, benefits, and loss of employment opportunities.

PLAINTIFF REQUESTS judgment against the Defendant as follows:

1. Legal relief;

a. Compensatory damages in whatever amount he is found to be entitled;

b. Liquidated damages in whatever amount he is found to be entitled;

c. An award of interest, costs, and reasonable attorney fees and expert witness fees.

2. Equitable relief;

a. An order reinstating Plaintiff to [his] prior position or equivalent position and/or front pay;

*2 b. An injunction prohibiting any further acts of wrongdoing, discrimination or retaliation;

c. Whatever other equitable relief appears appropriate at the time of judgment.

*Id.* at ¶ ¶ 19-20. The defendant has filed a motion pursuant to Federal Rule of Procedure 12(c) for judgment on the pleadings. For the purpose of the motion, the defendant concedes liability for failing to restore the plaintiff to his former position upon his return to work. However, the defendant insists that the plaintiff has failed to plead any compensable damages under the FMLA. The plaintiff has filed a response in opposition, and the matter was argued before the Court on August 9, 2005.

II.

[1] A motion for judgment on the pleadings under <u>Federal Rule of Civil Procedure 12(c)</u> on the ground that the complaint does not state a cognizable claim is reviewed under the standards that govern motions brought under <u>Rule 12(b)(6)</u>. *See* <u>Fed. R. Civ. P 12(c)</u>; <u>Vickers v. Fairfield Medical Ctr., 453 F.3d 757, 761 (6th Cir.2006)</u>; <u>Ziegler v. IBP Hog Market, Inc., 249 F.3d 509, 511-12 (6th Cir.2001)</u>. "The purpose of <u>Rule 12(b)(6)</u> is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." <u>Mayer v. Mylod, 988 F.2d 635, 638 (6th Cir.1993)</u>. When deciding a motion under that Rule, "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." <u>Cline v. Rogers, 87 F.3d 176, 179 (6th Cir.1996)</u>. "[A] judge may not grant a <u>Rule 12(b)(6)</u> motion based on a disbelief of a complaint's factual allegations." <u>Columbia Natural Res., Inc. v. Tatum, 58 F.3d 1101, 1109 (6th Cir.1995)</u>. "However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Ibid.* "In practice, 'a ... complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory.' " <u>In re DeLorean Motor Co., 991 F.2d 1236, 1240 (6th Cir.1993)</u> (emphasis in original) (quoting <u>Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir.1988)</u>).

[2] The remedy section of the FMLA states that an employer who violates the Act must pay the employee "damages equal to ... any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or ... any actual monetary losses sustained by the employee as a direct result of the violation." <u>29 U.S.C. § 2617(a)(1)(A)(i)</u>. The employer also may be liable for interest on those sums and, if the employer is unable to show that it acted in good faith, liquidated damages in an amount equal to the actual damages. <u>29 U.S.C. § 2617(a)(1)(A)(ii), (iii)</u>. Bordeau does not allege that the defendant paid him less than his full wages when he returned from his leave up to the time he injured himself on June 7, 2004. The defendant contends that Bordeau's inability to work and earn money because of his back injury does not amount to wage loss or actual monetary loss "by reason of" or "as a direct result of" Saginaw Control's FMLA violation. As a consequence, the defendant argues, the plaintiff has not pleaded damages recoverable under the FMLA and the defendant is entitled to judgment in its favor.

*3 The defendant places primary, if not its sole, reliance on <u>Dawson v. Leewood Nursing Home Inc., 14 F.Supp.2d 828 (E.D.Va.1998)</u>, in support of its argument. In that case, the plaintiff, who was employed as the director of nursing at the defendant nursing home, sought leave under the FMLA to treat her cancer. The leave was approved and thereafter the plaintiff spoke to her boss about returning to work. The boss claimed that he asked the plaintiff if she would be interested in a newly created position, director of admissions, because that position would be less stressful than her previous position as director of nursing. The plaintiff alleged that at the meeting her boss informed her she would not get her old job back. Sometime after the meeting, the plaintiff developed severe and permanently disabling cardiac and pulmonary symptoms, which the plaintiff claimed was a result of the stress generated by the meeting with her boss, and which precluded her from returning to work. Nonetheless, the plaintiff continued to receive full pay and

benefits until it was determined that she would never return to work for that employer. The district court granted summary judgment to the defendant because the plaintiff could claim no damages allowable under the FMLA. The court reasoned that "once it becomes clear that a plaintiff can recover nothing but a symbolic victory in that the defendant violated a statute, the lawsuit should be terminated." _Id. at 832_. The court found that the FMLA did not authorize the payment of nominal damages, and statutory language allowing damages for "wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation" and "actual monetary losses sustained by the employee as a direct result of the violation," _29 U.S.C. § 2617(a)(1)(A)(i)(I) & (II)_, was not broad enough to include damages for emotional distress, loss of future earnings because of the incapacity, or attorney's fees when no compensatory damages are proved. _Id. at 833-34_.

The Court agrees with that conclusion. Although there is no Sixth Circuit precedent on point, other courts have held that the language of the FMLA limits damages to actual, direct losses that ensue because of interference with or denial of rights under the Act. For instance, in _Nero v. Industrial Molding Corp._, 167 F.3d 921 (5th Cir.1999), the court held that out-of-pocket expenses, such as moving and job search costs, were not compensable under the FMLA. Those expenses plainly were not "wages, salary, employment benefits" as referenced in subsection I of the remedies statute. _Id. at 930_. The court also held that those expenses could not be considered "other compensation," as referenced in that subsection, because those expenses were never part of the employee's remuneration for work performed for the employer. The court reasoned that the term " 'other compensation' ... is indicative of a _quid pro quo_ relationship between an employer and an employee. We do not believe, nor does Nero argue, that we can characterize the out-of-pocket expenses in this case as having arisen from a _quid pro quo_ in the employment arrangement.... The out-of-pocket expenses are in the nature of consequential damages, and _§ 2617(a)(1)_ does not provide for recovery of general or consequential damages." _Ibid_.

*4 Similarly, in _Walker v. United Parcel Serv., Inc._, 240 F.3d 1268 (10th Cir.2001), the Tenth Circuit held that nominal damages were not recoverable under the FMLA. In that case, the plaintiff claimed that her rights were violated when she received a five-day suspension for excessive absences and job abandonment, when actually she took medical leave required by her pregnancy. The district court found that the plaintiff had suffered no actual damages as a result of that suspension because it ran concurrently with her disability leave and she therefore lost no wages or benefits as a result. The court of appeals rejected the plaintiff's attempt to analogize to Title VII precedents as justification for a nominal damage award. Instead, the court reasoned: "Because nominal damages are not included in the FMLA's list of recoverable damages, nor can any of the listed damages be reasonably construed to include nominal damages, Congress must not have intended nominal damages to be recoverable under the FMLA." _Id. at 1278_.

The Eleventh Circuit has determined that claims of mental anguish and loss of job security are not compensable under the Act. _See Graham v. State Farm Mut. Ins. Co._, 193 F.3d 1274, 1284 (11th Cir.1999) (holding that "the FMLA does not allow recovery for mental distress or the loss of job security"). In _Cianci v. Pettibone Corp._, 152 F.3d 723 (7th Cir.1998), the Seventh Circuit held that the plaintiff could not prove damages under the FMLA for wrongful denial of leave when she was fired for other reasons before her scheduled family leave was to have occurred. Therefore, according to the court, she "did not suffer any diminution of income, and, on the record before us, incurred no costs as a result of the alleged violation." _Id. at 728-29_.

In this case, the plaintiff alleges that he can no longer work because of a workplace injury. He contends that if he had been returned to his former job or a comparable one, as the FMLA requires, he would not have hurt his back doing physical labor. That may be true, but his back injury is not the _direct_ result of the employer's FMLA violation. At most, it is a consequence of placement in a laborer's job instead of a managerial position. However, consequential damages are not allowed under the FMLA, according to the precedents cited above.

Although the plaintiff has not alleged that he was denied "wages, salary, employment benefits, or other compensation," the provisions of subsection II of the damage

statute do not help him either. That subsection states that when a denial or interference with leave does not result in a loss of these things, a plaintiff may recover only the "actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks of wages or salary for the employee." 29 U.S.C. § 2617(a)(1)(A)(i)(II). The plaintiff has not pleaded that he has suffered a direct monetary loss; as noted above, he can state only a consequential loss.

*5 [3] However, there is another aspect of recovery to which the plaintiff may be entitled under the Act. "Any employer who violates section 2615 of this title shall be liable to any eligible employee affected ... for such equitable relief as may be appropriate, including employment, reinstatement, and promotion." 29 U.S.C. § 2617(a)(1)(B). The defendant disputes the plaintiff's eligibility for equitable relief in the form of front pay, and the district court in Dawson summarily dispatched the notion that the plaintiff there could receive such relief "because it is undisputed that she is now completely and permanently incapacitated and therefore no longer capable of performing her job." Dawson, 14 F.Supp.2d at 833. Nonetheless, in McBurney v. Stew Hanson's Dodge City, Inc., 398 F.3d 998 (8th Cir.2005), the court suggested that a plaintiff who could not return to work because of a disability that allegedly resulted from the denial of FMLA leave might be eligible for equitable relief in the form of front pay. Id. at 1001-1002 & n. 2 (noting that "[f]ront pay is designed to provide an equitable remedy when it is impractical to order the employee's reinstatement to his or her previous job"). That theory is consistent with Sixth Circuit precedent, as well.

[4] Front pay and back pay are both equitable remedies available under the Act. See Arban v. West Publishing Corp., 345 F.3d 390, 406 (6th Cir.2003). Front pay can supplement back pay for the continuing future effects of discrimination to make the victim whole, but can never be a substitute for it. Mallinson-Montague v. Pocrnick, 224 F.3d 1224, 1237 (10th Cir.2000).

Front pay is granted to compensate victims of discrimination for the continuing future effects of discrimination until the victim can be made whole.... Thus, front pay may be used to supplement back pay when back pay will not adequately compensate the victim because immediate promotion cannot occur because there are no positions available ... or where reinstatement is not available and the victim is making less money at her current job.

Mallinson-Montague, 224 F.3d at 1237 n. 17 (internal quotes and citations omitted).

[5][6] Back pay is awarded for lost earnings up to the date the employee was reinstated or returned to the position he should have held had the violation not occurred. Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 849, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001). Similarly, front pay is money awarded for future services the employee likely would have performed had the illegal actions of the employer not occurred. In Arban, the court of appeals described the function and propriety of front pay as an equitable remedy under the FMLA:

[W]e find that the FMLA provides for front pay.

While the determination of the precise "amount of an award of front pay is a jury question," the initial "determination of the propriety of an award of front pay is a matter for the court." Roush v. KFC Nat'l Mgmt. Co., 10 F.3d 392, 398 (6th Cir.1993) (ADEA claim).

*6 Although "[r]einstatement is the presumptively favored equitable remedy," it is not appropriate "where the plaintiff has found other work." Roush, 10 F.3d at 398.... "No per se rule governs the appropriateness of front pay damages in a particular case.... Ultimately, the question to be answered is whether front pay damages are needed in a particular case to make the plaintiff whole." Wilson v. Int'l Bro. of Teamsters, 83 F.3d 747, 756-57 (6th Cir.1996). Several factors must be considered when determining the propriety of an award of front pay, including "an employee's duty to mitigate, the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present value of future damages and other factors that are pertinent on prospective damage awards." Roush, 10 F.3d at 399.

*Arban,* 345 F.3d at 406.

There has been no factual development in this case yet presented to the Court. Discovery may produce facts that persuade the Court that the plaintiff is entitled to equitable relief, and "front pay damages are needed in [this] case to make the plaintiff whole." *Ibid.* Certainly, reinstatement is not possible where the plaintiff physically is unable to return to work. The equities in the case may point to an award of front pay, however, if it is "appropriate," 29 U.S.C. § 2917(a)(1)(B), in light of all the circumstances. *See McBurney,* 398 F.3d at 1002 n. 2. The plaintiff's physical injury, although not a proper basis itself for the award of compensatory damages, could be a fact the Court would use to determine the propriety of front pay in lieu of reinstatement. The Court finds, therefore, that the plaintiff has set forth a compensable claim in his complaint under the FMLA.

III.

The plaintiff may not recover damages for loss of income or earning capacity because of the back injury he suffered while working as a laborer for the defendant. Those damages are not allowable as compensatory damages under the FMLA. To the extent that the plaintiff seeks compensatory damages for such injury, the defendant is entitled to judgment on the pleadings. However, the plaintiff may be entitled to equitable relief for the claimed FMLA violation, which could include front pay or back pay. The complaint, therefore, is not subject to dismissal in its entirety.

Accordingly, it is **ORDERED** that the defendant's motion for judgment on the pleadings [dkt # 10] is **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that the plaintiff's claim for compensatory damages is **DISMISSED WITH PREJUDICE.** The plaintiff may proceed on his claim for equitable relief.

It is further **ORDERED** that counsel for the parties shall appear at a status conference on Tuesday, September 19, 2006 at 3:00 p.m. to discuss further case management deadlines.

E.D.Mich.,2006.
Bordeau v. Saginaw Control & Engineering, Inc.
--- F.Supp.2d ----, 2006 WL 2466239 (E.D.Mich.)

In *Carpo v. Wartburg Lutheran Home for the Aging*, No. 05 CV 1169 (JG), 2006 U.S. Dist. LEXIS 74856 (E.D.N.Y. Oct. 16, 2006), the employer's policy required that employees returning from FMLA leave provide a doctor's certification that the employee was able to resume *full duties*. On the expiration of 12 weeks of leave the employee returned with a handwritten doctor's note on a prescription slip reading: "Pt may attempt to resume work on 2/3/04." The employer found the note unacceptable. The employee was subsequently fired. Carpo sued alleging interference with her FMLA right to return to work by her employer's refusal to accept her return to work certification.

The Court found the fitness-for-duty certification was sufficient as a matter of law. DOL regulations provide that the certification "need only be a simple statement of an employee's ability to return to work." 29 CFR 825.310(c). The court rejected the employer's argument that, to be valid, a certification attesting to the fitness for duty of an employee returning from FMLA leave must contain a definitive statement that an employee is able to return to her "full duties." According to the court:

> A simple statement that the employee can return to work, possibly including qualified language and possibly excluding specification of the level of work an employee is capable of, is all that the regulation requires. Accordingly, the present of words like "attempt" and the absence of phrases like "full duties" in Carpo's not is not fatal...

The court observed that a definitive statement that an employee is able to return to her "full duties" is not supported by the plain language of the statue and DOL regulations. The regulations, the court continued, "contemplated the presence of qualified, precatory, or broad language in a valid note," because it provides a procedure to clarify such notes and prohibits the employer from delaying the employee's return to work while such clarification is sought.

The policies behind the FMLA, inadequate job security for employees with serious health conditions that prevent them from working for temporary periods, also supported the courts conclusion. The court explained:

> If accepted, Wartburg's interpretation of 29 CFR 825.310(c) would subvert this purpose. Employers would be permitted to reject a doctor's certification simply the doctor had written, "It is my believe that employee can return to work," or "Employee likely can return to work safely, but should be careful and attentive." In implementing the FMLA, the Secretary of Labor did not intend to make an employee's job security subject to he caprice of the language in a doctor's note, or to empower employers to play "gotcha" when notes fail to include talismanic phrases. To the contrary, it has advanced the Congressional goal of providing job security for those employees who suffer from serious but temporary health conditions by requiring only a "simply statement of the employee's ability to return to work"--and nothing more-- from the doctor.

The court also opined that, as written, the note satisfied the more demanding standard advocated by the employer. According to the court, by stating that Carpo "may attempt return to work," the note conveyed the doctor's belief that, as a medical matter, Carpo was able to resume her work. The qualifying language "may attempt" does not intimate that Carpo is incapable of resuming her full duties, the court found, Rather, it conveyed that the doctor was not absolutely certain, but, because it is very likely that she can, it is safe for her to try.

**Comment:** The decision is interesting as much for what it doesn't say as what it does. The decision enforces a literal reading of 29 CFR 825.310(c) regarding the permissible scope of a fitness for duty inquiry. It does now, however, address the requirement in 29 CFR 825.214(b) that, to be entitled to job restoration from FMLA leave an employee must be able to perform all essential job functions. Carpo's employer, in a sense, included the requirement that an employee be able to perform all essential job functions on their return as part of the return to work fitness-for-duty certification. The court clearly held that the employer interfered with the employee's rights by incorporating this requirement as part of the fitness-for-duty certification. Presumably, at least for this court, an employer must accept the return of an employee based on a simple statement that the employee may return, and then determine after the employee comes back to work whether the employee is able to perform all essential job functions. If not, the employee would not have perfected his or her FMLA right to return to work. Of course, the employee's return might be permitted pursuant to more generous

agency policies, the terms of a collective bargaining agreement, or other laws. If so, the employee's rights would be governed by those laws and not the FMLA.



Exibit 2

Trista Brown.

## Quest Diagnostics

### Guidelines to Determine "Disability"
### Under the Americans With Disability Act

*endorsehearta slathern.*

1. Identify the Employee's physical or mental impairment(s).
   lower abdomen pain, morphine, hystorectomy

2. What major life activities are limited or precluded?

*Standing*

- ☑ Caring for oneself
- ☑ Walking
- ☐ Breathing
- ☑ Lifting
- ☐ Sleeping
- ☐ Sexual Activity
- ☑ Performing manual tasks
- ☐ Seeing
- ☐ Learning
- ☐ Thinking
- ☐ Reproduction
- ☑ Working

3. For each activity checked above, provide complete examples from work and personal life. Stands all day @ work.

4. For each activity, determine how long has the Employee experienced these limitations? after surgery   10/28/54

5. Was the Employee precluded from or limited in performing a major life activity all of the time or only some of the time? all the time

*full expected recovery*

6. Were any limitations present only during certain periods? of limitations in performing a major life activity were episodic rather than constant, how often and for how long a period did these limitations occur? Constant.

7. How severe were the limitations when they did occur? "debilitating"



*NO restrictions - NO document from any Modicale [handwritten annotation]*
*NO ADA WAS Needed !! Ther were [handwritten annotation]*

d.   To the extent that Brown alleges to have been denied an accommodation,

accommodation cannot reasonably be made for Brown's alleged disability that would enable her

to perform the essential functions of the job or meet other job related requirements without

imposing significant difficulty or expense on Quest Diagnostics's business.

Dated: April 11, 2007                QUEST DIAGNOSTICS INCORPORATED


                              By:    s/ Jody W. Moran
                                     Jody Wilner Moran



Jody Wilner Moran
Laura K. Kendall
Jackson Lewis LLP
320 W. Ohio Street, Suite 500
Chicago, IL 60610
Tel:  (312) 787-4949
Fax:  (312) 787-4995

From: Hickey, Kathleen M
Sent: Friday, November 19, 2004 10:07 AM
To: Gatewood, Wendy W
Cc: Patel, Biren J; Ford, Georgia C; Patton, Denise C
Subject: FW: Disability absence of Trista Brown, emp ID #084969 (CHI)


Wendy,

As you can see, looks like she's getting recertified beyond 12/7. As soon as Aetna confirms this with the physician, I will call Trista and begin the ADA review. Let me know if you have any other concerns.


Thanks!

Kathy

-----Original Message-----
From: Holz, Christine [mailto:HolzC@aetna.com]
Sent: Friday, November 19, 2004 10:58 AM
To: Hickey, Kathleen M; Fedgo, Karen
Cc: Patton, Denise C; Ford, Georgia C; Gatewood, Wendy W; Patel, Biren J; Reilly, Irene M; Wiley, Sharon L
Subject: RE: Disability absence of Trista Brown, emp ID #084969 (CHI)


Hi Kathy,

Thanks for the note. I put a call in to the physician this morning..and hope to have an answer for ya shortly. More than likely there will be a recertification and this claim will go to a nurse in our office for review.

As of now the return to work date is unknown.

Enjoy your day!

Christine

-----Original Message-----
From: Hickey, Kathleen - QuestDiagnostics
Sent: Friday, November 19, 2004 10:27 AM
To: Holz, Christine; Fedgo, Karen
Cc: Patton, Denise C; Ford, Georgia C; Gatewood, Wendy W; Patel, Biren J; Reilly, Irene M; Wiley, Sharon L
Subject: FW: Disability absence of Trista Brown, emp ID #084969 (CHI)
Importance: High


Christine/Karen (Aetna),

As requested below, can you tell me if it is likely that Trista will recover in time to return to work on or before 12/7? If not, we need to determine if Trista's position can be replaced due to a significant business need to do so.

Kindly let me know as soon as possible.

Thank you,

Kathy

> -----Original Message-----
> From:    Gatewood, Wendy W
> Sent:    Thursday, November 18, 2004 4:32 PM
> To: Hickey, Kathleen M
> Cc: Larson, Sara A

2

D000000072

| | |
|---|---|
| **From:** | Holz, Christine [HolzC@aetna.com] |
| **Sent:** | Thursday, December 02, 2004 12:31 PM |
| **To:** | Hickey, Kathleen M; Patel, Biren J; Rebar, Linda |
| **Cc:** | Muller, Lauren E; Fedgo, Karen; Ford, Georgia C; Gatewood, Wendy W; Patel, Biren J; Reilly, Irene M; Wiley, Sharon L |
| **Subject:** | RE: Disability absence of Trista Brown, emp ID #084969 (CHI) |
| **Importance:** | High |

Hi Everyone,

Linda Rebar, RN is reviewing this claim for recertification.    I have
forwarded this email to hear attention.

Best of luck Kathleen.

Christine


-----Original Message-----
From: Hickey, Kathleen - QuestDiagnostics
Sent: Thursday, December 02, 2004 1:11 PM
To: Patel, Biren J
Cc: Muller, Lauren - QuestDiagnostics; Fedgo, Karen; Holz, Christine;
Ford, Georgia C; Gatewood, Wendy W; Patel, Biren J; Reilly, Irene M;
Wiley, Sharon L
Subject: RE: Disability absence of Trista Brown, emp ID #084969 (CHI)
Importance: High


No, Biren. Her claim is certified through Tuesday, 12/7 and I'm still
waiting for Aetna's recertification, if necessary. As soon as we know,
we'll let you know.  Going forward, please contact Lauren Muller as
she's been assigned to handle this case as my last day with Quest
Diagnostics is tomorrow, 12/3.

Karen/Christine (Aetna):  On 11/19, Christine advised that this case was
in the process of getting reassigned to a NCM for further handling and
likely recertification.  Can you please tell me who's handling this
case?  We need to know about the recertification as soon as possible as
her FMLA expires on Tuesday, 12/7 and, if the claim gets recertified,
her position will need to be replaced.  Lauren will need to perform an
ADA review for this as well.

Thanks,

Kathy

-----Original Message-----
From: Patel, Biren J
Sent: Thursday, December 02, 2004 12:57 PM
To: Hickey, Kathleen M
Subject: RE: Disability absence of Trista Brown, emp ID #084969 (CHI)


Hi Kathleen,
Do you have any updates on her?
Thanks.


-----Original Message-----

1

D000000071

## Muller, Lauren E

**From:** Muller, Lauren E
**Sent:** Wednesday, December 15, 2004 3:33 PM
**To:** Fleischhacker, Evelyn F
**Subject:** RE: Trista Brown

Thank you. I will notify if Trista is released to return to work before her 12 months has expired. In addition, there was a slight misunderstanding in regards to her FMLA expiration date. The employee was originally sent a letter stating that her FMLA expired on 12/16. Therefore, we are honoring that date.

Lauren

-----Original Message-----
**From:** Fleischhacker, Evelyn F
**Sent:** Wednesday, December 15, 2004 3:25 PM
**To:** Muller, Lauren E
**Cc:** Larson, Sara A
**Subject:** Trista Brown

Our understanding is that Trista Brown's job protection rights expire on December 16. We have sent her a replacement letter and will be offering another candidate her position on December 16.

By the way we thought her FMLA expired December 7 so don't know where the December 16th date came from.

Lyn Fleischhacker
HR Manager
Chicago Business Unit
Quest Diagnostics
630-475-4732

1

D000000070

No one reviewed Mullen's opinion
that CP not covered under ADA

Doesn't receive any other med docs
in review — only conversation
w/ (CP-interview)

Docs are given to Aetna

Opinion made solely on conversation
w/ ee

Doesn't have any medical background
Received ADA training — minor in HR
           = courses in
             ADA at school
           - trng & info
             on ADA from
             work
           - trng at school &
             work on how
             to analyze
             whethers
             Someone is
             disabled under
             ADA

Hysterectomy - major surgery that
precludes CP from having
children

   Understands that bearing children is major
life activity-but this wasn't cause why she is out
i.e. ~~surgery~~ recovery from surgery was

To: Lila
From: K. Barber
Date: 10/4/05
Re: Brown v. Crest
Subject: T/C w/ CP

CP states she currently
doesn't have insurance
and has a tumor on
her esophagus that
needs to be removed

Can schedule surgery in
1-2 weeks from date
received insurance.

Then for 6-8 weeks recovery
That 4 months insurance adequate

Since 2/18, hasn't received
pay.

wants back pay: 2746/month
+ 200/month 40/k

CP OK w/ 10k & 4 month insurance

No one reviewed Mullen's opinion
that CP not covered under ADA.

Doesn't receive any other med. docs
in review — only conversation
w/ CP (i.e. w/ ee).
↓
Docs are given to Aetna.

Opinion made solely on conversation
w/ ee.

Doesn't have any medical background.
Received ADA training — minor in HR
— courses in
ADA at school
— trng & info
on ADA from
work
— trng at school &
work on how
to analyze
whether
someone is
disabled under
ADA

Hysterectomy — major surgery that
precludes CP from having
children.

. . . . . . . . . . . . . . . . . . . from a maid

No one reviewed Muller's opinion
that CP not covered under ADA.

Doesn't receive any other med docs
in review — only conversation
w/ CP (i.e. w/ ee).

Docs are given to Aetna.

Opinion made solely on conversation
w/ ee.

Doesn't have any medical background.
Received ADA training — minor in HR
— courses in
ADA at school
— trng & info
on ADA from
work
— trng at school &
work on how
to analyze
whether
someone is
disabled under
ADA

Hysterectomy — major surgery that
precludes CP from having

~~There was never~~ Based on a note from the Dr  
dated  
10-19-04  
And failed  
to Denise  
Patton

## Delay in Processing FMLA Leave Request Interfered with FMLA Even Though Employee Was Never Denied Leave During the Interim and Was Ultimately Granted FMLA Leave

An employer's failure to provide the forms required by the company to request FMLA leave for several months despite repeated requests by the employee interfered with the employee's FMLA rights by discouraging the employee from taking FMLA leave, even though the employee was allowed to take leave while she waited for the forms and was ultimately granted FMLA leave.

Continue reading "Delay in Processing FMLA Leave Request Interfered with FMLA Even Though Employee Was Never Denied Leave During the Interim and Was Ultimately Granted FMLA Leave " »

March 28, 2007 in Chill, Employee Notice, Interference, Medical Certification | Permalink | Comments (0) | TrackBack (0)

## Notice in Handbook Requiring Employee to Provide Medical Certification Insufficient Absent Timely Employer Request

An employer must specifically ask that an employee submit medical certification at or around the time leave is requested. Absent such a timely and specific request, notification in an employee handbook that an employee must provide medical certification is insufficient to place the employee on notice that medical certification was required in order for the employee to perfect his/her request for FMLA leave.

In *Lucterhand v. Granite Microsystems, Inc.*, No. 05-CV-1047, 2007 U.S. Dist. LEXIS 15072 (E.D.Wisc. Mar. 2, 2007), Plaintiff Mark Lucterhand re-injured his knee at work. He underwent surgery and was released from the hospital five days later. He used three days paid sick leave and two vacation days during this time. There is no question that the employer was aware of the reason for his leave.

Lucterhand returned to work with no restrictions but with limited mobility. Essentially, he was released to return to work at his request based on pressure to return to work quickly from his employer. The physician who released him did so with the understanding that, as acting director of global operations, he would spend most of his time behind his desk and off his feet. Lucterhand return to work but attended two physical therapy appointments each week for several weeks, and also had follow-up visits with his surgeon. Because he could not drive, Lucterhand also used public transportation, which also limited his availability at work.

After his return his employer received profit estimates that fell short of expectations. Lucterhand's supervisor expressed his displeasure with the performance of his operation. The supervisor began to make statements suggesting that Lucterhand should have been on the workroom floor more helping, which he could not do because of his knee surgery. Lucterhand was terminated a month after returning to work. Lucterhand alleges that he was told he was terminated because the company did not believe that his injury was as extensive as claimed. The company alleges that it terminated Lucterhand because of poor performance. Lucterhand sued alleging violation of the FMLA.

The Company handbook contains an FMLA policy. In pertinent part, the policy required an employee to provide the company with a certification of health care provider form to perfect his/her right to FMLA leave. Company policy also provided that employee's could elect to substitute paid leave for unpaid leave. In the event that an employee failed to meet the certification requirement, company policy provided that the leave request may be delayed or denied.

Lucterhand never specifically asked for FMLA leave or provided Granite with a medical certification. As a consequence, the employer argued that Lucterhand failed to perfect his right to FMLA leave, and, therefore, his FMLA retaliation claim must fail. Lucterhand contended that the defendants' undisputed knowledge of his injury provided Granite with sufficient notice that Lucterhand's leave may qualify as FMLA leave. The court agreed with Lucterhand.

The employer also argued that Lucterhand's failure to provide certification from a health care provider in accordance with the handbook was fatal to his FMLA claim. The Court disagreed. The Court distinguished the cases relied on by the employer, noting that in those cases the employee failed to provide medical certification that had been specifically requested by the employer at or around the time the employee gave notice of the need for FMLA-qualifying leave. None of the cases, the Court observed, involved the situation, as in Lucterhand, where the employer simply relied on language in their employee handbook to provide notice to the employee of the certification requirement and made no specific request for certification.

Comment: Employers must notify employees each time it intends to require medical certification. 29 CFR 825.305(a). Notice generally must be provided at the time the employee gives notice of the need for leave or within two business days thereafter. 29 CFR 825.305(c). Absent a specific request for certification, an employer may not simply rely on the fact that the medical certification requirement is set forth in an employee handbook or manual.

Interestingly, the employer argued in the alternative that Lucterhand's failure to follow the procedures set forth in the handbook rendered his request for leave outside of the protections of the FMLA. Granite argued that by failing to provide medical certification in accordance with company policy Lucterhand's absence was not covered by the FMLA. The Court disagreed, concluding that the employer was aware that the absence could be FMLA qualifying from the known facts of his injury. The employer could have confirmed that by conducting an investigation and/or requesting medical certification but did not.

I think the Court missed the employer's argument. The argument is not about the adequacy of the employee's notice of the need for FMLA leave. Rather, it was whether the employee was affirmatively electing not to have the leave covered by the FMLA by failing to abide by the known requirements of company leave policy to support FMLA leave with medical documentation. A few courts have suggested that the failure to follow known company leave procedures does not permit an employer to deny otherwise qualifying FMLA leave, but it could be evidence to suggest that the

TIME   : 12/28/2004 10:31
NAME   : QUEST DIAGN
FAX    : 8157445215
TEL    :
SER.#  : BROC2J213542

| | |
|---|---|
| DATE,TIME | 12/28  10:31 |
| FAX NO./NAME | 18774449788 |
| DURATION | 00:00:21 |
| PAGE(S) | 01 |
| RESULT | OK |
| MODE | STANDARD |



**LOYOLA
UNIVERSITY
HEALTH SYSTEM**

Loyola University Chicago

## CERTIFICATE TO RETURN
## TO WORK OR SCHOOL

Brown, Invola
1655324

Rebar

2327L

_Nista Brown_
PATIENT'S NAME

has been examined by me on

_____
DATE

and is able to return to work/school on

_12/27/04_
DATE

with the following limitations:

Pt has return appointment to
see Dr. Potter on 1/25/05 for
additional post op follow up.

P0077



LOYOLA
UNIVERSITY
HEALTH SYSTEM
Loyola University Chicago

Brown, Mole
1655324

## CERTIFICATE TO RETURN
## TO WORK OR SCHOOL

Rebar

23272

Vista Brown
_____
PATIENT'S NAME

has been examined by me on

_____
DATE

and is able to return to work/school on

12/27/04
_____
DATE

with the following limitations:

Pt has return appointment to
See Dr. Potkul on 1/25/05 for
additional post op follow up.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

12-23-04
_____
DATE

_____
PHYSICIAN'S SIGNATURE

708 327 3314
_____
TELEPHONE NUMBER

**LOYOLA UNIVERSITY CARDINAL BERNARDIN CANCER CENTER**
Maywood, Illinois 60153

WHITE - PATIENT'S EMPLOYER/SCHOOL    YELLOW - MEDICAL

P0078

why she $^{CP}$ was out & not that

limitation from med condition has to be directly related to why out in order to be disabled under ADA

Reason why she thought not disabled is b/c limitation related to why out is temporary & expected full recovery?

→ Doesn't know where learned this.

Mueller's understanding was that CP was to be released to work shortly after FMLA expires

understands this b/c shortly ~10 days after FMLA expiration CP was going to be released to work?

didn't tell this to anyone

knew this b/c CP said "short term" & full recovery.

12/27/04 - recevell info email that CP will return on 12/27

From Linda Robar-Apt...

DA047

Muller would receive updates
from Aetna on how long EE
will be out & when return.

Aetna won't give what med condition is?

Prior to 12/27/04, on 12/14/04 received
Aetna that pending return
to work date of 12/23/04.
Pending means it can charge
& waiting for info from Physician
(based on past experience w/ Aetna)

12/16/04
+ sent email
that re-certified
through 12/22
but didn't
tell anyone
Aetna will return
on 12/23
b/c it was
just pending
+ not for
Swe

Nothing prior to 12/14/04.

CP didn't say when expected
to return to work — just
said it was short-term.

didn't wouldn't last
months upon months
(could be 6 months)
or more

email to Wendy Eastpwood
Biren Patel - HR (charge)
Georgia Ford - HR

Didn't ask CP when CP
expected to recover

no response
from them.

no other
discussions
or email w/ HR
about when
will return
or recover.

CP was supposed to return on
12/27/04 but CP didn't.

Muller CP doesn't know why
CP didn't return on 12/27.
If return → absent to confirm if re-cleaned? 32148

Doesn't know who she contacted in HR but answer was no. She doesn't know wh CP didn't return.

Prior to 12/27 no discussion of when CP was supposed to return to work

After case closed & ee allowed to return to work, HR takes over.

Muller didn't have conversations w/ CP's Spon

To: File
From: K. Bates
Date: 7/20/06
Re: Brown v. Crest Drugs
Subject: T/C w/ Lamont Moore (Jefferson present)

Director of HR - for Chicago business unit
since 5/04

dok. - 5/04

Supervisor - dotted Lauren Randall -
Regional Direc of
HR for West

Carl Koeneman -
Managing Direct for
Chicago business
unit.

Oversee core process dept.
responsible for recruiting
responsible for el issues

3rd or 4th Quarter → District Depuy
2004 - Became aware of hardships Patton Squared ("SW Dist.")
in Cl's District. Worked at
staff to supply temps to Cl's
district. Took over recruiting

P00050

functions for this district. There were
staffing issues in providing adequate
# of staff to service patients

Fall 2004 - Had telephone contact w/ CO

Became aware of these issues when
                                        talking w/
Joliet location -              Patton & Buye
-scheduling issues
→ PSE - Patient Service Center
    profit/revenue affected -
    b/c cost of temp & couldn't
    service enough patients
    . Scheduling affected

affected          operating margin affected
b/c
cost of
temp        imagines each Patient Service
            Center has its own operating
District    #s. Not sure.
has operating
budget
also.       Didn't see any data on
            operating costs

            -there was conversation about
            his absence affected
            the Joliet facility

said definitely   w/ Denise Patton & Ron
needed            Suyer - Lee Banger -
person            Acting Mgr. for Sth Dist.
                                        DONE!

Thinks financial dept. could run

doesn't know if run #s a

Not sure what Patton who work to do it
to look at were looking at
of C's absence of effect

Doesn't know if ran #s, or data

Patton & Burger
in order to keep efficiency
of where it should be,
— not just profit
but also customer
service

certain amt of patient
should go through
facility.

keeping service levels —
Not sure what is
included in "service
level" — thinks
it includes amt of
time to draw patient

Didn't see data on service
levels

Doesn't know if Patton
or Burger saw them

P0052

analysis if have restriction
rights under ADA.
They do reasonable
accommodation analysis

_or Lauren Mueller_
~Kathleen Hickey said CPs
date?↓ med. condition is
prior not covered under ADA
to FMLA to Bakury & Patten & so
leave & no accomm required under ADA
prior to
being replaced Always do analysis once
↓ FMLA runs out - don't
Don't know of any situation
do one where don't.
unless
looks like Gatewood offered jobs to
FMLA CP in Evanston &
will run Arlington Heights.
out ↓

Decided to filter CPs calls
through Gatewood b/c CP
calling different HR people.

CP said needed another
surgery.

Gatewood had to go -
will continue conversation
tomorrow at 10.00 a.m

F00U5

To: File
From: R. Bados
Date: 11/7/05
Re: Brown v. Qwest
Subject: Message from Jefferson

R. doesn't want to try settlement
through me & wants cases to
go to mediation.

POOlele

To: File
From: K. Batey
Date: 11/3/05
Re: Brown v. Quest
Subject: T/c w/ Jefferson

R. wants to send both cases
to mediation to attempt to
mediate them.

I told her that cl can try to
settle cases.

She wants to meet in person w/
op present.

POCO7

To Julie
From R. Busby
Date: 10/4/05
Re: J. Brown vs Quest Diagnostics
Subject: T/C w/ Gatewood

Offered CP position in Evanston & Arlington Heights b/c those were the closest available openings to CP & closest to Wood Dale.

- Wendy gatwood Stated that I would have to take a position in the Southwest District And the Business would have to Be in within 30 miles radius the above Postion was over the required radius so there
- for Severance was offered - unless I Stated on Disability, as was stated By Luven muller, ther was no need as stated Before Dec 16th, I just wasn't able to Receive a Certification letter from the Dr. But several messages to Denise Patten, Wendy Gatwood and Lemont Moore was aware of my ability to out restrictions to Return to work.

P00068

Wormley interviewed early last
year. He was in
pipeline for months
trying to find him a job

30 - 60 - 70 day prior to
wormley being
hired he was in
pipeline - when 1st
interviewed.

12/20/04 - started

didn't work for R.
prior to this date.

Wormley did clinicals
at R.

Will see if Health & Disability
Services keeps file re
ADA determination.

CP calling about benefits,
pay, letter Gatewood sent/transfer
forms to Sarah Larsen, Laurent
Biron Patel - HR Rep who
covers benefits

P00970

decided to filter calls to
Gatewood.

CP not interested in Evanston
offered to & Arlington Heights b/c
Er mid too far away from
Dec 04 home.

→ verbal conversation &
no documentation of it.

~~Forwarded~~ Mailed to CP
a list of open positions

actually; said just visit cdn't find this letter
website
~ not CP informed Gatewood that
mailed CP applying for post
letter Gatewood told CP that
she's not recruiter
& said that proper
date? way is to apply
↓ online or fax resume
didn't ✓ posting to HR fax #
keep notes which goes
to Recruit
CP said you already
have resume, Gatewood Amy Arshali
said don't have resume but & HR Asst
can email resume or fax resume 05

PC071

CP   and she will send to recruiter w/ posting ct.
Never faxed or emailed resume.

Since April, Laura Simeon works
   as Recruiter

→ Gatewood considered those conversations
   w/ CP harassing

a coup.   Spoke w/ Simeon about CP
months    applying. Didn't say whether
ago       email or fax. Simeon said
          would forward resume to hiring Super
          at each location. Don't know what
Feb/March                      locations sent to.
~05       Doesn't recall speaking w/ Arsenau
          about CP applying.

Severance would stop if
CP returned to work.
   CP continued to receive
   severance & began applying
when severance ran out.

   Didn't take as lump
sum.

CP left on payroll to
   continue to be

P0012

certified & get health care.

If don't take severance
as lump sum — eligible
for health care.

CP taken off payroll — 1/10/05.
& had benefits until then.

Certified until 12/16 health
Continued to pay benefits
From 12/16 until 1/10/05
a/but CP contributing.

Severance salary continued
until are

(certified
until
12/16)

12/26 — 1/10 still paid benefits.

OP said can't see dr x
so gave CP a few
a couple weeks

→ Severance pay started 1/10
& continued for
weeks severance salary &
benefits

P0013

80% of time hiring
supervisor at location
is sole decision
maker in hiring

sometimes HR or
higher sypen involved

To: File
From: K. B-ts
Date: 10/13/05
Re: Ls Brown v. Quest
Subject: Interview w/ CP

12/15 – started applying for Phlebotomists
for different locations

~ July '05 – last time applied

Location
- Tinley Park
- Orland Park
- Joliet
- Aurora (Fox Valley ~~Mall~~)
- ~~Fox Valley Mall~~
- Palos Heights
- Bolingbrook
- Naperville

CP states she could of returned w/
restriction prior to 12/16 but
she talked w/ Peather who said
it's OK – don't need to. So,
CP got Dr. note releasing Cor
on 12/27. CP would have
returned & worked until 1/05
when she would have went on
another FMLA leave (which would
have been reinstated for new yr.) to get tumor

on esophagus removed. OR originally
planned to get both hysterectomy
& tumor removed at same time
but then found out that
she didn't have enough FMLA
time to do both.

To: File
From: K. Berg
Date: 7/10/06
Re: Brown v. Quest
Subject: T/c w/ Jefferson

Gatewood unable to make
interview Jefferson will
see if can reschedule
Kelly or Gatewood in
next few days.

2/2/13    Spoke w/ Gatewood. Gatewood
said ignore the 2/13 letter
Gatewood said will devise
letter.

2/2/14 – Spoke to Gatewood again,
~~saying that~~ Gatewood said
that not aware of CP
speaking w/ Patton or
Lamatt. about returning
to work. Gatewood said
she had nothing to do
w/ filling post. → just
writing letter.

Gateway never offered job
in Evanston or Arlington
Heights.

CP asked about post in
Aurora, Gateway said
the post. was already
filled.
+
However, Hartine – Super in Aurora –
said that post in Aurora
available. CP will
fax this post opening

Joy Corbon (w)        ⎫  Only Phlebotomist
Lillie Murphy (w)      ⎬  working at R
Atma Vina Sharma ⎭  b/f CP went
     (Asian-Indian)         on leave &
CP not aware of a Wormley    only ones there
being hired after CP's discharge.   when CP discharge

1/10/05 letter says, "reduction
in force" & not a replacement.

12/13/04 - (P spoke w/ (LNU))  - Group Leader
CP said that will talk to Dr
& will get back b/f  12/14. -
will get return to work note
b/f 12/16.

                        Lamar / Lamont
12/16/04-      Lamont (LNU) - Title ?-
          said don't worry about faxing
Lamar    Dr.'s letter about returning
said      to work b/c filled
he was    position already  on 12/16/04.
new hire
to clear
up Quest. 12/7, 12/8, 12/9 - L/m for Pathoy
          that received letter from
          R, & attempting to
          return to work
b/f 12/16.

CP will fax over copies
of her transfer.

R. Ira Gatewood said
never received these
requests.

1 week b/f mediation, CP spoke
w/ Patton. Patton said
that got call from Head HR-
Lamont - that not to
put CP on schedule b/c
CP not returning to work.

Patton said she got this
call when CP leaving message
that will be attempting to
return to work.

b/c
already
filled post

11/27 - Spoke w/ Gatwood again
after sending Dr's Note.
Gatewood said no posts
at all available

There was post also available
in Joliet.

13.    Submit a list of individuals involved in the decision to replace Trista Brown in her position at Respondent's Joliet facility. Include the following information for each individual listed: name, date of hire, most recent position title, most recent department, name of immediate supervisor, last know home address, last know home telephone number, social security number, and date of discharge if applicable.

RESPONSE: Respondent objects to this Request on the grounds that it is overbroad and unduly burdensome and harassing in nature. Respondent further objects to this Request to the extent it seeks information not relevant to or reasonably calculated to lead to the discovery of evidence relevant to the allegations in the EEOC Charge.

Subject to and without waiving these objections, Respondent identifies the following individuals: (1) LaMonte Moore. DOH: 05/03/04, position: Human Resources Director, dept.: Human Resources, immediate supervisor: Karl Koenemann; (2) Leigh Oberfeld-Berger, DOH: 02/26/90, position: Director, Field Operations, dept.: Field Operations, immediate supervisor: Karl Koenemann; and (3) Denise Patton. DOH: 08/18/97, position: Branch Operations Supervisor, dept.: Field Operations, immediate supervisor: Brenda Reiss.

To: File
From: K. Batey
Date: 10/4/05
Re: Brown v. Quest Diagnostics
Subject: 7/c w/ Gatewood & Lamont
Dorsett

made decision to replace CP early
December b/c

If CP was going to be
certified 12/7, need someone
at that office &
also then, CP was going
to be out past 12/7
& thought FMLA would
run out 12/7

then learned FMLA
runs out until 12/16, then
kept CP on until 12/16.

Decision was made in early
December that if CP
could not return prior to
expiration of FMLA, need
to replace CP.

POOL9

mid 11/04 - started looking at
whether CP's post should
be replaced.

Sarah Larson initiated
based on Denise Pathenis
request.

Busy Patient Service Center →
had Phlebotomist in
"pipe line"

"pipe line" = ~~that;~~
when hire 10 consulting - already interviewed,
have resume, did clinicals
at Quest for school.

Phlebotomy school requires clinical
work.

↓ Joliet- busy & need a
full-time Phlebotomist &
not just floaters.

have float phlebotomist
to people out on vacation
sick, etc.



December 13, 2004

Trista Brown
7 N. Raynor
Joliet, IL 60435

Dear Trista:

We have been notified by Health and Disability Services that your Family Medical Leave Act (FMLA) entitlement will expire on December 7, 2004. As such, you no longer have job restoration rights associated with FMLA.

I am in a position of having to notify you that we are going to move forward to replace your position as Phlebotomy Services Rep I at the Joliet location. We were compelled to take this step due to our extreme business need to staff this location to meet our customer needs.

At this time, we understand that you currently do not have a return to work date. When you are released to return to work, please notify Lauren Muller and your Aetna disability representative immediately. You will still remain an active employee with Quest Diagnostics for up to 12 months of disability leave. Please speak to Lauren in regards to the continuation of your benefits.

At the time your Leave of Absence ends and you notify us of your intent to return to work, we will attempt to place you in an open PSR I position if one is available. If no position is available, your employment with Quest Diagnostics will be terminated. If you are released to return to work prior to 12 full months of disability, you may be eligible for severance benefits.

Please feel free to contact me if you have any questions or additional information.

Regards,


Wendy Gatewood
Human Resources Manager



Quest Diagnostics Incorporated

1855 North Mittel Boulevard
Wood Dale, Illinois 60191
www.questdiagnostics.com

 Quest
Diagnostics

December 14, 2004 – REVISED LETTER

Trista Brown
7 N. Raynor
Joliet, IL 60435

Dear Trista:

We have been notified by Health and Disability Services that your Family Medical Leave
Act (FMLA) entitlement will expire on December 16, 2004. As such, you no longer have
job restoration rights associated with FMLA.

I am in a position of having to notify you that we are going to move forward to replace
your position as Phlebotomy Services Rep I at the Joliet location. We were compelled to
take this step due to our extreme business need to staff this location to meet our customer
needs.

At this time, we understand that you currently do not have a return to work date. When
you are released to return to work, please notify Lauren Muller and your Aetna disability
representative immediately. You will still remain an active employee with Quest
Diagnostics for up to 12 months of disability leave. Please speak to Lauren in regards to
the continuation of your benefits.

At the time your Leave of Absence ends and you notify us of your intent to return to
work, we will attempt to place you in an open PSR I position if one is available. If no
position is available, your employment with Quest Diagnostics will be terminated. If you
are released to return to work prior to 12 full months of disability, you may be eligible for
severance benefits.

Please feel free to contact me if you have any questions or additional information.

Regards,

Wendy Gatewood
Human Resources Manager

Moore, Patton, Foster, Burger
involved in decision
to replace CP.

Not sure when to CP
coming back, no job
restriction under FMLA +
needed to staff the
position.

Moore made final decision,
and based on Patton's
recommendation that needed
replacement. (Patton's recommendation
done on previous factors)

another
factor;
didn't know
when CP
returning

another
factor
in decision

There was effort across
whole company to reduce
temps + be affecting operating
margins.

across Lamont's business unit - collection
area, funnel area, phlebotomy

deciding
by
Leadership
team

clmy conversation of
Lamont + CP to figure out -
told her to go through
Entenwood

Doesn't remember how
many x's

Doesn't remember why CP
ever expected to work a
```

wanted to return

Spoke w/ Gatewood
about / CP returning
to work slip

Talking about this b/c
Gatewood talky to
CP about returning to
work.

Doesn't CP had conversation
w/ Gatewood about returning
to work
↓

b/c Gatewood said CP
wanted to return to
work

There was confusion
about when CP could
return to work or when will
CP was to rectify it or     return
when she was supposed
to return to work

At time CP replaced
CP didn't have return
to work date.

Gatewood had this conversation w/ CP

CP was
supposed
to deal
w/ disability
process

corporate disability

Moore didn't talk to anyone
if CP disabled

✓. can't remember who
said not covered under
ADA.

Gatewood
relayed
info.

Moore
not in
phone
call

Doesn't remember if b/f or
after decision to
replace CP.

thinks it was b/f.

Gatewood
said
that
disability
not
covered
under
ADA.

Doesn't know who initiated
conversation of corp.
disability

Ee would notify corporate
disability about
when ee will return
to work.

this
conversation
prompted
b/c if
covered
under
ADA would
hold job
open.

1st time learned
that CP might have
cancer was in 2004
when Patton said
it might be cancer —
after dialogue Patton
said this to Moore.

Not aware of hysterectomy until

last week, when spoke
w/ atty - Jefferson.

To File
From: K, Bates
Date: 7/20/06
Re: Brown v. Qvest
Subject: Tlc w/ Denise Patton

Branch Operation Supervisor
for SW District.
for 3 1/2 yrs

d.o.h. 8/1997

Supervisor - Brenda Reese - Bich
Operation Mgr
for South District

SW District - 7 locations currently.
12 locations when CB
there

7 ← Patient Service Centers
5 ← In Office Phlebotomist
in Drs office

Involved in decision to replace
CB.

doesn't
know who
made decision
to replace

made recommendation to
Lee Burger = Mgrs of all Districts
south District & North

~12/16/04 - Burger said Patton could fill position.

Patton's → Recommendation was that to replace
⊥ position

of this full-a confirmation when CP will return
⊥ to work

Benefits Solution ── Patton
sends emails → Didn't ask when will return
when will return ── Emails sent out periodically
↓ b/c of temps temps benefits
never received Staff burn-out due to coverage extra
anything when will O/T for Staff
return. ─
email sent to ── operating budget = each district has
Patton sending / operating budget
per was return
the was to date ── expected to keep budget
not pending. thinks w/ in certain parimeters
that each
Dist has "o? ── over
outside of budget b/c of
temps + O/T

Lee Burger would know

Didn't know in dollars
how much.  Did know
that it was over - budget

Didn't know what budget
was at that time.
Thought it was over b/c
paying more to temps & paying o/t

By "budget" looking at how much
paying or e paying more temp
than paying regular ee.

"Over "Budget" - could pay less
if had regular ee.

"Staff burn-out" - ees had to open
& close facility which made
long days e weren't getting
any off days.
        Staff complained ~ after
        1 month doing this about extra time

Temp can only draw (can't
register, can't process patients)
so regular ees have to pick
up slack

There s certain amt of ees
required at Joliet
        to service patients in quality
        manner

Another: fatigued staff e less
factor          staff caused quality to
in recommendation      go down
                noticed increase in patient
                wait time.

DOO4O

Patient signs in & Phleb puts
time of draw — analysis
is done on monthly basis
on how long it takes.

↓
monthly analysis indicated
that waiting longer.

↓
Jefferson will see if can obtain

Didn't talk to CP while out on
leave of absence.

10/27/04 2 — CP told Patton that CP had terminal
cancer & it had spread.

↓
day 6/P left on leave.

↓
didn't share w/ anyone.

↓
only discussed w/ Jefferson &
Moore in preparation for
this interview.

Patton spoke w/ Burger about
CP returning to work but doesn't
remember if Burger knew
when CP was returning. Patton
told Burger that Patton
didn't know when she was returning.

Not aware of any analysis R.
did to determine if CP disabled
under ADA

Not aware that CP attempting
or wanted to return to
work when made recommendation
to replace.

To: File
From: K. Bates
Date: 7/20/06
Re: Brown v. Quest
Subject: T/w Lauren Muller (Jefferson present)


Benefits Specialist - since 9/04
d.o.h. - 9/04
Supervisor - Tom Della (Disability Lead
                                              Mgr.)
- Manage & process leaves of absence
                                     ADA
                                     FMLA
                                     Military
        ↓
- ~~receives call from Benefit Sp~~
- Does ADA reviews after FMLA
  expired ↓

        discuss w/ ee what ADA is
        & discuss w/ ee why on
        leave of absence to
        determine if fall under
        ADA & can protect job


Received CP's case from Kathleen
Hickey from Benefits Specialist.
        ↓                        CP's
        all info regarding her leave.          only said
        of absence. ✓                          - not covered
                                                under
                                                ADA

doesn't   ← Gave opinion to Gatewood that
know date      CP didn't fall under disability
                                     → Based off conversation

To: File
From: K. Bytos
Date: 8/15/03
Re: Brown v. Qwest
Subject: T/C w CP

Brandie Fay - Phlebotomist 815/744-5742
(work; no home #) can verify
Wormley's job - i.e. that
only a temp/Floater, never filled
CP's post; when Wormley started
a loft.

~2 weeks ago → CP spoke w/ John (LNU) - Supervisor
at Joliet ~ Jefferson about posted
opening in Joliet (where CP worked)
John replaced Patton. John said
for CP to fax resume. John
didn't know who CP is. CP
faxed ~ 2 weeks ago. CP
talked to John last monday &
he said post was filled.

Her top of her sent folder
indicates the emails she sent
inquiry about posts

w/ CP regarding CP's leave of absence
doesn't know date.

Discussed w/ CP
list of
guidelines
from R.
- why act on leave
- what ongor life activities
limited
- how long experienced disabill-
- how affected
- if full recovery ex
- how severe

Did take notes w/ CP - Handwritten
notes. (notes not included in file
given to Moore. Then Moore
given to Jefferson.

will provide
These notes
to me.

today to
Jefferson
transcripts
re.

CP said - lower abdominal
pain associated w/
all the ← hysterectomy - short
time.
term

taking care
of tarself
hallery, manual,
tasks limited

Doesn't
know why
had hysterectomy

short term ← however so CP said
full recovery expected

CP said
- endometriomg

10/28/04 - Surgery

Didn't know had uterun
cancer.

P6044

w/ CP regarding CP's leave of absence
doesn't know date.

Discussed w/ CP
- why not on leave
list of          - what major life activities
guidelines         limited
from R.     - how long experienced disability
            - how affected
            - if full recovery ex
            - how severe

Did take notes w/ CP — Handwritten
notes. (notes not included in file
given to Moore then Moore
given to Jefferson.

will provide
these notes
to me
↓
today to        CP said - lower abdominal
Jefferson         pain associated w/
tomorrow to   all the ← hysterectomy - short
recieve          time.            term
re.                              ↓
                telling care  walking, manual
Doesn't ←       of oneself    tasks limited
know why                         ↓
had hysterectomy  short term ← however so CP said
                            full recovery expected

CP said
- endometriosis      10/28/04 - surgery
↓
Didn't know had uterine
cancer.                    P6044

To: File
From: K. Bato
Date: 8/15/03
Re: Brown v. Qwest
Subject: T/c w CP

Brandie Fay - Phlebotomist  815/744-5742
(work; no home #)  can verify
Wormley's job - i.e. that
  only a temp/Floater, never filled
  CP's post; + when Wormley started
  a [...].

↗2     CP spoke w/ John (LNU) - Supervisor
weeks     at Joliet + Jefferson about postel
ago       opening in Joliet (where CP worked)
       John replaced Patton. John said
       for CP to fax resume. John
       didn't know who CP is. CP
       faxed a 2 weeks ago. CP
       talked to John last monday &
       he said post was filled.

       Her fax of her sent folder
       indicates the emails she sent
       inquiring about posts.

13.    Submit a list of individuals involved in the decision to replace Trista Brown in her position at Respondent's Joliet facility. Include the following information for each individual listed: name, date of hire, most recent position title, most recent department, name of immediate supervisor, last know home address, last know home telephone number, social security number, and date of discharge if applicable.

**RESPONSE:** Respondent objects to this Request on the grounds that it is overbroad and unduly burdensome and harassing in nature. Respondent further objects to this Request to the extent it seeks information not relevant to or reasonably calculated to lead to the discovery of evidence relevant to the allegations in the EEOC Charge.

Subject to and without waiving these objections, Respondent identifies the following individuals: (1) LaMonte Moore. DOH: 05/03/04, position: Human Resources Director, dept.: Human Resources, immediate supervisor: Karl Koenemann; (2) Leigh Oberfeld-Berger, DOH: 02/26/90, position: Director, Field Operations, dept.: Field Operations, immediate supervisor: Karl Koenemann; and (3) Denise Patton. DOH: 08/18/97, position: Branch Operations Supervisor, dept.: Field Operations, immediate supervisor: Brenda Reiss.

To: File
From: K. Barto
Date: 10/4/05
Re: Brown v. Quest Diagnostics
Subject: T/c w/ Gatewood & Lamont

made decision to replace CP early
December b/c

If CP was going to be
certified 12/7 need someone
at that office &
also knew CP was going
to be out past 12/7
& thought FMLA would
ran out 12/7

then learned FMLA
runs out until 12/16, then
kept CP on until 12/16.

Decision was made in early
December that if CP
could not return prior to
expiration of FMLA, need
to replace CP.

POOLA

mid 11/04 - started looking at
whether CP's post should
be replaced.

Sarah Larson initiated
based on Denise Patha's
request.

Busy Patient Service Center →
had Phlebotomist in
"pipe line"

"pipe line" =
when hire recruiting - already interviewed,
have resume, did clinicals
at Quest for school.

Phlebotomy school requires clinical
work.

→ Joliet - busy & need a
full-time Phlebotomist +
not just floaters

have float phlebotomist
to people out on vacation
sick, etc.



December 13, 2004

Trista Brown
7 N. Raynor
Joliet, IL 60435

Dear Trista:

We have been notified by Health and Disability Services that your Family Medical Leave Act (FMLA) entitlement will expire on December 7, 2004. As such, you no longer have job restoration rights associated with FMLA.

I am in a position of having to notify you that we are going to move forward to replace your position as Phlebotomy Services Rep I at the Joliet location. We were compelled to take this step due to our extreme business need to staff this location to meet our customer needs.

At this time, we understand that you currently do not have a return to work date. When you are released to return to work, please notify Lauren Muller and your Aetna disability representative immediately. You will still remain an active employee with Quest Diagnostics for up to 12 months of disability leave. Please speak to Lauren in regards to the continuation of your benefits.

At the time your Leave of Absence ends and you notify us of your intent to return to work, we will attempt to place you in an open PSR I position if one is available. If no position is available, your employment with Quest Diagnostics will be terminated. If you are released to return to work prior to 12 full months of disability, you may be eligible for severance benefits.

Please feel free to contact me if you have any questions or additional information.

Regards,


Wendy Gatewood
Human Resources Manager

Quest Diagnostics Incorporated

1355 North Mittel Boulevard
Wood Dale, Illinois 60191
www.questdiagnostics.com

 Quest
Diagnostics

December 14, 2004 – REVISED LETTER

Trista Brown
7 N. Raynor
Joliet, IL 60435

Dear Trista:

We have been notified by Health and Disability Services that your Family Medical Leave
Act (FMLA) entitlement will expire on December 16, 2004. As such, you no longer have
job restoration rights associated with FMLA.

I am in a position of having to notify you that we are going to move forward to replace
your position as Phlebotomy Services Rep I at the Joliet location. We were compelled to
take this step due to our extreme business need to staff this location to meet our customer
needs.

At this time, we understand that you currently do not have a return to work date. When
you are released to return to work, please notify Lauren Muller and your Aetna disability
representative immediately. You will still remain an active employee with Quest
Diagnostics for up to 12 months of disability leave. Please speak to Lauren in regards to
the continuation of your benefits.

At the time your Leave of Absence ends and you notify us of your intent to return to
work, we will attempt to place you in an open PSR I position if one is available. If no
position is available, your employment with Quest Diagnostics will be terminated. If you
are released to return to work prior to 12 full months of disability, you may be eligible for
severance benefits.

Please feel free to contact me if you have any questions or additional information.

Regards,

Wendy Gatewood
Human Resources Manager

Moore, Patton, Foster Burger
involved in decision
to replace CP.

Not sure when to CP
coming back - no job
restoration under FMLA +
needed to staff the
position

Moore made final decision.
And based on Patton's
recommendation that needed
replacement. (Patton's recommendation
based on previous factors)

another
factor -
didn't know
why CP
return

There was effort across
whole company to reduce,
temps/ftes affecting operations
any manager

another
factor
in decision

dif.y.s.y.
by the
Leadership
team

across Lamont's business unit - collection
area, financial area, phlebotomy
thru conversation w/
Lamont, CP believes
told her to go through
Enterwood

Doesn't remember how
many x?

Doesn't remember why CP
ever expected to work or

wanted to return

Spoke w/ Gatewood
about / CP returning
to work slip

Talking about this b/c
Gatewood talking to
CP about returning to
work.

Doesn't CP had conversation
w/ Gatewood about return
to work

↓

b/t Gatewood said CP
wanted to return to
work

There was confusion,
about when CP could
return to work or when will return
CP was to rectify if ~
after she was supposed
to return to work

At time CP replaced
didn't have return
to work date.

Gatewood had this conversation w/ CP

CP was
supposed
to add
w/ disabled
services

Moore didn't both to anyone if CP disabled — corporate disability

Gatewood related info Moore not in phone call — V. can't remember who said not covered under ADA

Doesn't remember if b/f or after decision to replace CP

thinks it was b/f

Gatewood said that disability not covered under ADA — Doesn't know who initiated conversation w/ corp disability

Ee would notify corporate disability about when ee will return to work

this conversation prompts b/c if covered under ADA would hold job open — 1st time learned that CP might have cancer was in 2004 when Patton said it might be cancer — after diagnosis Patton said this to Moore.

Not aware of hysterectomy until

last week, when spoke
w/ atty - Jefferson.

To: File
From: K. Bates
Date: 7/20/06
Re: Brown v. Quest
Subject: T/c w/ Denise Patton

Branch Operations Supervisor
for SW District

for 3½ yrs

d.o.h. 8/1997

Supervisor - Brenda Reese-Brch
                Operations Mgr
                for South District

SW District - 7 locations currently,
              12 locations when CP
              there.

              7 ← Patent Service Centers
              5 ← In Office Phlebotomist
                    (in Dr's office)

Involved in decision to replace
CP.

doesn't
know who
made decision
to replace

made recommendation to
Lee Burger - Mgrs of all Districts
                    South District & North

~12/16/04 — Burger said Patton could fill position.

Patton's → Recommendation was that to replace
         ↓   position
of this full confirmation when CP will return
        for work

Benefits Solution    Patton
sends emails    →   Didn't ask when will return
when will return    Emails sent out periodically
        ↓           b/c of Transp Temps beinghires
never received       Staff burn-out due to coverage  extra
anything when will   O/T for Staff
return. —
email sent to       operating budget ← each district has
Patton reading       operating budget
person returning
to work to date     expected to keep budget
in pending. thinks   w/ in certain parameters
that each
Dist has an  →  ↓ over
             outside of budget b/c of
             temps & O/T

Lee Burger would know

             Didn't know in dollars
             how much. Did know
             that it was over-budget

             Didn't know what budget
             was at that time.
             Thought it was over b/c
                     paying more to Temps & paying OT

By "budget" looking at how much
paying OT e paying more Temp
than paying regular ee.

"Over "Budget" - could pay less i
if had regular ee.

"Staff burn-out" - ees had to open
& close facility which made
long days e weren't getting
any off days.

Staff complained after ~1 month
doing this about extra time

Temp can only draw (can't
register, can't process patients)
so regular ees have to pick
up slack

There is certain amt of ees
required at Joliet
to service patients in quality
manner

Another: fatigued staff e less
Factor staff caused quality to
in recommendation go down
notired increase in patient
wait time.

PC040

Patient signs in & Phleb puts
time of draw - analysis
is done on monthly basis
on how long it takes.
↑
monthly analysis indicated
that auditing longer.
↓
Jefferson will see if can obtain

Didn't talk to CP while out on
leave of absence.

10/27/04 — CP told Patton That CP had terminal
cancer + it had spread.

↓
doy 6/F left on leave.

↓
didn't share w/ anyone.

↓
only discussed w/ Jefferson &
Moore in preparation for
this interview

Patton spoke w/ Burger about
CP returning to work but doesn't
remember if Burger knew
when CP was returning. Patton
told Burger that Patton
didn't know when she was returning.

P0041

Not aware of any analysis R.
did to determine if CP disabled
under ADA.

Not aware that CP attempting
or wanted to return to
work when made recommendation
to replace.

To: File
From: K. Bates
Date: 7/20/06
Re: Brown v. Quest
Subject: T/c w/ Lauren Muller (Jefferson present)


Benefits Specialist - since 9/04
d.o.h. - 9/04
Supervisor - Tom Della (Disability Lead Mgr.)

- Manage & process leaves of absence -
        ADA
        FMLA
        Military
    ↓
- receives call from Benefit Spc
- Does ADA reviews after FMLA
  expired ↓

        discuss w/ ee what ADA is
        & discuss w/ ee why on
        leave of absence to
        determine if fall under
        ADA & can protect job.


Received CP's case from Kathleen
Hickey — from Benefits Specialist.
            ↓
                    CP's
    all info regarding her leave     only said
    of absence                       - not covered
                                      ↓ under
                                      / ADA

doesn't ← Gave opinion to Gatewood that
know date    CP didn't fall under disability
(b/c FMLA   under ADA → Based off conversation

w/ CP regarding CP's leave of absence
doesn't know date.

Discussed w/ CP
list of  { - why oct on leave
guidelines { - what major life activities
from R. { limited
{ - how long experienced disability
{ - how effected
{ - if full recovery ex
{ - how severe

Did take notes w/ CP - Handwritten
notes. (notes not included in file)
given to Moore Then Moore
will provide     given to Jefferson.
these notes
for me
                    CP said - lower abdominal
friday to           pain associated w/
Jefferson    all the ← hysterectomy - short
transcript         time              term
re.
                        for her own   walking + manual.
                        or herself    tasks limited
Doesn't
know why
had hysterectomy   short term ← However see CP said
                                full recovery expected.
CP said
- endometriomy      10/28/04 - Surgery

                    Didn't know had uterine
                    cancer            until

To: File

From: K. Byto,

Date: 8/15/03

Re: Brown v. Qwest

Subject: T/C w CP

Brandie Fay – Phlebotomist 815/744-5742 (work; no home #) can verify Wormley's job – i.e. that only a temp/Floater, never filled CP's post; & when Wormley started a loft.

~2 weeks ago → CP spoke w/ John (LNU) – Supervisor at Joliet & Jefferson about posted opening in Joliet (where CP worked). John replaced Patton. John said for CP to fax resume. John didn't know who CP is. CP faxed ~ 2 weeks ago. CP talked to John last monday & he said post was filled.

Her fax of her sent folder indicates the emails she sent inquiry about posts.

Subject:    RE: Disability absence of Trista Brown, emp ID #084969
(CHI)
>
> what are the chances that she will be back that day - are the
> expectations that she will be recertified?  If so, can we do ADA right

> away, we want to replace ASAP.
>
> thanks
>
>   -----Original Message-----
> From:     Hickey, Kathleen M
> Sent:     Friday, November 05, 2004 9:52 AM
> To: Patton, Denise C
> Cc: Ford, Georgia C; Gatewood, Wendy W; Patel, Biren J; Reilly,
Irene M; Wiley, Sharon L
> Subject:  FW: Disability absence of Trista Brown, emp ID #084969
(CHI)
>
> Please be advised that Aetna has certified Trista's claim through
> 11/28.  I will keep you posted on her return to work release.
>
> Thanks,
>
> Kathy
>   -----Original Message-----
> From:     Hickey, Kathleen M
> Sent:     Thursday, October 14, 2004 11:33 AM
> To: Patton, Denise C
> Cc: Ford, Georgia C; Gatewood, Wendy W; Patel, Biren J; Reilly,
Irene M; Wiley, Sharon L
> Subject:  Disability absence of Trista Brown, emp ID #084969 (CHI)
>
> Trista contacted us to process her disability claim for her absence
> that will begin on 10/28.  The absence is tentatively approved,
> pending certification from Aetna.  At that time, I will keep you
> updated on her disability certification and return to work release.  A

> copy of the FMLA Designation letter is attached for your reference.
>
> If you should have any further questions, please contact me.
>
> Thank you,
>
>
> Kathleen M. Hickey
> Benefits Specialist
> Health & Disability Services
> Quest Diagnostics, Inc.
> 1290 Wall Street West
> Lyndhurst, N.J. 07071
> (201) 729-8569 - direct
> (877) 718-4020 x8569 - toll free
> (201) 729-8901 - f
> Kathleen.M.Hickey@QuestDiagnostics.com
>
>   << File: Brown, Trista.doc >>

============================================================================
======
The contents of this message, together with any attachments, are
intended only for the use of the person(s) to which they are addressed
and may contain confidential and/or privileged information. Further, any
medical information herein is confidential and protected by law. It is
unlawful for unauthorized persons to use, review, copy, disclose, or
disseminate confidential medical information. If you are not the
intended recipient, immediately advise the sender and delete this

D000000073

message and any attachments. Any distribution, or copying of this
message, or any attachment, is prohibited.
================================================================
======

------------------------------------------
This e-mail may contain confidential or privileged information. If you
think you have received this e-mail in error, please advise the sender
by reply e-mail and then delete this e-mail immediately. Thank you.
Aetna


================================================================
======
The contents of this message, together with any attachments, are
intended only for the use of the person(s) to which they are addressed
and may contain confidential and/or privileged information. Further, any
medical information herein is confidential and protected by law. It is
unlawful for unauthorized persons to use, review, copy, disclose, or
disseminate confidential medical information. If you are not the
intended recipient, immediately advise the sender and delete this
message and any attachments. Any distribution, or copying of this
message, or any attachment, is prohibited.
================================================================
======

------------------------------------------
This e-mail may contain confidential or privileged information. If you
think you have received this e-mail in error, please advise the sender by
reply e-mail and then delete this e-mail immediately. Thank you. Aetna

4

This e-mail may contain confidential or privileged information. If you
think you have received this e-mail in error, please advise the sender by
reply e-mail and then delete this e-mail immediately. Thank you. Aetna

12/15/2004

| | |
|---|---|
| From: | Muller, Lauren E |
| Sent: | Tuesday, January 11, 2005 8:58 AM |
| To: | Gatewood, Wendy W |
| Subject: | Trista Brown |

Wendy,

Aetna contacted me this morning and stated "Her claim remains closed. She was released to rtw and if she didn't, there is no cinical to support her remaining out of work."

Please follow up on this with me.  Thank you.

Lauren Muller
Benefits Specialist
Quest Diagnostics
1290 Wall St. West
Lyndhurst, NJ 07071
Phone - (201)-729-8594
Toll Free - 877-718-4020 x 8594
Fax - (201)-729-8901
E-mail - lauren.e.muller@QuestDiagnostics.com

10:53 a.m. – July 8th

Hi Wendy, Trista Brown here, uhm, just want you to know that I continue to see emails and my faxes and I know these positions are available. Uhm, your Aurora office, I was told you have three positions in that area, but when uhm, I contacted uh, Wendi, who is handling your I·guess the hire… uh… who is the supervisor for that area, all of a sudden said after she had mentioned my name that uhm, you no longer have a position available. I'd like to know really what is really going on? Uhm, again, I… I email to you, I fax those positions uh, it's common knowledge I have faxed that off to the EEOC. I've let them know that all these positions available and that I am totally being blackballed, used against, prejudiced against, discriminated against or something. Because everytime my name is mentioned… and I went into your Aurora office, I understand that you do have a position in Fox Valley. Uhm, there are three positions available in that area. After talking to your supervisor, I understand all of a sudden you don't have that available and that you'll keep me in mind. So, what really is really going on? And please contact uhm the investigator. I did also contact uhm, the CEO office too, concerning what's going on here. I'm not hiding about that. So that you know. They do contact with the Quest Diagnostics – Uhm, the investigator is Conrad B-A-T-O-G investigator. And I'm letting him know that I have applied a many of times since December of 16th trying to get a position and I'd really like to know what's going on. I do have names and numbers of people who allow me know that you know you guys are blackingballing me. You are not allowing me to be put in a position, which I know that these positions available and we all know what procedure. So, again, I know that you have my email, I know that you have my fax, I have faxed them over 4 or 5 times to you and I know that you have that. And I know that I also talked to Wendi who is over your Aurora office now, your supervisor there and she said now you do not have those positions available, but yet it's on the computer showing they are. So, please give me a call back or contact Conrad B-A-T-O-G the investigator. Because you know this is really uhm, its something to be looked into. I appreciate your time and effort. (Inaudible) get this name, this information and I appreciate a call back or if you don't call me, call Conrad B-A-T-O-G and explain to him why everytime I put in for a position and you have positions available why I always need you to call back. Again, Trista Brown 815-722-0316. Thank you.

D000000140

8:53 a.m. August 26th

Miss uh Gatewood uhm, this is Trista Brown calling, uh, I would like you to explain to me how I continue to send you my resume and these positions available that uhm, you seem to be, Human Resources seems to be blackballing me for what I understand. So, I wanted you to give me a call concerning that. Uhm, telling me what is really going on there? And I do know what's going on. And I mean I know that I sent, I don't know how many resumes to you and I shouldn't have because I did used to be an employee and I was only terminated because you guys didn't want to send me back and you do not have another person that you put in my position. So we all have established that, our sources have established that. So tell me why I continue to send you resumes for positions that are totally have not been filled that you continue to not.... to reject my resume. I want something in writing stating that if you let me know and that will be forwarded again to my lawyer. Thank you. (Hung up)


2:27 p.m. November 7th

Hello Wendy, Trista Brown, uhm, I was calling to confirm that it was received. And I was just calling to see if you got it. If you get this message, please call me on my cell phone, 815-557-0321. I just want to make sure and confirm that it does reach you and that you did not have a problem receiving it. Okay. Thank you.


8:24 a.m. on November 8th

Yes, Miss Gatewood, ah I think this is like the third time I left you a message. Uhm, I'm just calling to find out if you received that information. If you did, please give me a call or leave me a message at 815-557-0321. Thank you. Bye.


8:35 a.m. on November 9th

Hi Wendy, Trista Brown calling. Uhm, (clears throat), I'm calling to find out, uhm, I didn't know if you was aware of this – this case is under investigation. So, I'm not sure if, if basically, uhm, like I said, uhm from all the times that I send my uhm resume to your.... to those places which you've had openings that you didn't bother to uhm forward them to until now. I just wanted to know are you aware that this case is under investigation? So that you will be a literally put into position -- I don't want to jeopardize uhm my case against Quest when it concerns the EEOC. Give me a message back and make sure theres something that uhm I shouldn't, I mean that you shouldn't be doing or whatever because it is an investigation. So, uh, again I'm not sure because when you, I mean when I uhm put this information to you it was way back in wow, (inaudible) like

December, January, February, March, April all the way up to June. And any time I got a response from you guys it was October after the (inaudible) was made on your hiring practices. So, I want to make sure that you uhm aware that this is under investigation. Thank you.

# KARYN D JEFFERSON, LLC

Konrad Batog
December 9, 2005
Page 4

was already in the position and working out well with the client, Quest Diagnostics simply converted her to a regular, full-time Employee on November 14, 2005, after she fulfilled the appropriate hours with the temporary agency.

The decision maker with primary responsibility for filling this position was Brandy Zapotosky (Caucasian), Branch Operations Supervisor.

## *Naperville, IL - Requisition Number 52141 - Phlebotomy Service Rep (PSR) I*[7]

On June 10, 2005, Quest Diagnostics posted an opening for the position of Phlebotomy Service Rep (PSR) I (Requisition Number 52141) in Naperville, IL. Ms. Brown did not seek consideration for the position until June 19, 2005, when she sent in her resume via facsimile. Quest Diagnostics' management, however, elected to fill the position with an internal candidate, Maritza Perez (Hispanic).[8] Ms. Perez, who has been a Quest Diagnostics employee since March 3, 2003, transferred to this position on July 5, 2005. Quest Diagnostics' policy is to consider internal candidates prior to doing a search externally. Indeed, Ms. Brown was deemed an external candidate at the time of the selection.

The decision maker with primary responsibility for filling this position was Wendi Sparta (Caucasian), Quest Diagnostics' Branch Operations Supervisor.

*See also signed Document (notived from previous*
## *Joliet, IL - Requisition Number 50533 - Phlebotomy Service Rep (PSR) I*[9]  *employee)*

On May 2, 2005, Quest Diagnostics posted an opening for the position of Phlebotomy Service Rep (PSR) I (Requisition Number 50533) in Joliet, IL. Ms. Brown sought consideration for the position on May 13, 2005, when she sent in her resume via facsimile. Quest Diagnostics' management, however, elected to fill the position with an external candidate Lavenia Walker (Black).[10] Ms. Walker started on July 5, 2005.

Once again, this particular position was for an In-Office Phlebotomist in which the phlebotomist works only in a physician's office drawing only their patients. Ms. Walker had previously worked in the physician's office for a competitor of Quest Diagnostics and when we assumed the business, Ms. Walker was already working for the client and understood the nature of how they run their business.



---

[7] Copies of the interview file for this position which contains resumes and employment applications of potential candidates who applied for this position are attached as **Exhibit E.**

[8] See **Exhibit E** for a copy of Ms. Perez's employment application.

[9] Copies of the interview file for this position which contains resumes and employment applications of potential candidates who applied for this position are attached as **Exhibit F.**

[10] See **Exhibit F** for a copy of Ms. Walker's employment application and resume.

2005, Quest Diagnostics has no resume for Ms. Brown in its job file.

## *Naperville, IL - Requisition Number 48847 - Phlebotomy Service Rep (PSR) I[2]*

On April 1, 2005, Quest Diagnostics posted an opening for the position of Phlebotomy Service Rep (PSR) I (Requisition Number 48847) in Naperville, IL. Ms. Brown did not seek consideration for the position until June 19, 2005, when she sent in her resume via facsimile.[3] Quest Diagnostics' management, however, elected to fill the position with an external candidate, Beth Gray (Caucasian) with eighteen (18) years of phlebotomy experience.[4]

Ms. Gray was not a new candidate to Quest Diagnostics. Rather, she had applied with Quest Diagnostics previously in 2004 and was offered a position. However, due to other personal reasons, she chose at the time not to accept. Moreover, she had a favorable reference from a Quest Diagnostics Sales Representative. Having accepted Quest Diagnostics' offer, Ms. Gray commenced her employment on October 3, 2005.

The decision maker with primary responsibility for filling this position was Wendi Sparta (Caucasian), Quest Diagnostics' Branch Operations Supervisor.

## *Downers Grove, IL - Requisition Number 49540 - Phlebotomy Service Rep (PSR) I[5]*

On April 15, 2005, Quest Diagnostics posted an opening for the position of Phlebotomy Service Rep (PSR) I (Requisition Number 49540) in Downers Grove, IL. Ms. Brown did not seek consideration for the position until June 19, 2005, when she sent in her resume via facsimile. Quest Diagnostics' management, however, elected to fill the position with an external candidate, LaToya Bates (Black), who had already been working in the position as a temporary employee since June 2, 2005.[6]

Due to Ms. Bates' prior "temporary employee" status, she fell under Quest Diagnostics' "Temp to Perm" program. This program requires temporary employees to work in said capacity until they accumulate a set number of hours before that can be hired by Quest Diagnostics and become permanent employees. In this instance, the position was for an In-Office Phlebotomist in which the phlebotomist works only in a physician's office drawing only their patients. Since Ms. Bates

---

[2] Copies of the interview file for this position which contains resumes and employment applications of potential candidates who applied for this position are attached as **Exhibit B**.

[3] Copies of the documents Ms. Brown forwarded to Quest Diagnostics on June 19, 2005, including her resume, and which contain the requisition numbers of the positions for which Ms. Brown sought consideration, are attached hereto as **Exhibit C**.

[4] See **Exhibit B** for a copy of Ms. Gray's employment application and resume.

[5] Copies of the interview file for this position which contains resumes and employment applications of potential candidates who applied for this position are attached as **Exhibit D**.

[6] See **Exhibit D** for a copy of Ms. Gray's employment application.

# KARYN D JEFFERSON, LLC

The decision maker with primary responsibility for filling this position was John Mejia (Hispanic), Quest Diagnostics' Branch Operations Supervisor.
*Naperville, IL - Requisition Number 53267 - Phlebotomy Service Rep (PSR) I*[11]

Ms. Brown's resume was not received for this position. Rather, in November 2005, she indicated that she had previously applied for the position on July 26, 2005. The position was posted on July 26, 2005. The position was filled with an internal candidate, Alexandra De La Torres (Hispanic).[12] Ms. De La Torres, who has been an employee since March 24, 2003, transferred to this position on October 29, 2005. Quest Diagnostics' policy is to consider internal candidates prior to doing a search externally. Indeed, Ms. Brown was deemed an external candidate at the time of the selection

The decision maker with primary responsibility for filling this position was Wendi Sparta (Caucasian), Quest Diagnostics' Branch Operations Supervisor.

*See d occurrent Serviera lesalex* [handwritten]

## Ms. Brown's Efforts to Secure Employment After July 31, 2005

[handwritten margin notes: my letter sent Jan 18, said I could reapply for a position at request available]

Noteworthy to mention is the fact that Ms. Brown sent her resume for additional positions after July 31, 2005. In this regard, on November 8, 2005, almost one month after filing this Charge, Quest Diagnostics' Human Resources department received a fax from Ms. Brown indicating an interest in the following positions:[13]

   i.   Requisition Number 49547 – PSR I, Naperville, IL – This position was filled with an external candidate (Caucasian). The employee began working on November 2, 2005, prior to Quest Diagnostics' receipt of Ms. Brown's resume. This position was a part-time, Saturday only position.

   ii.  Requisition Number 52785 – PSR I, Flossmor, IL – This position is currently on hold, as the organization is evaluating the necessity of filling this opening.

   iii. Requisition Number 53555 – Specimen Collection Technician, Tinley Park, IL – This position has been offered to an external candidate (Black) with a pending start date. The candidate interviewed on August 9, 2005. Final interviews were conducted prior to receiving Ms. Brown's resume.

---

[11] Copies of the interview file for this position which contains resumes and employment applications of potential candidates who applied for this position are attached as **Exhibit G**.

[12] See **Exhibit G** for a copy of Ms. De La Torre's employment application and resume.

[13] Copies of the documents Ms. Brown forwarded to Quest Diagnostics on November 8, 2005, including her resume, and which contain the requisition numbers of the positions for which Ms. Brown sought consideration, are attached hereto as **Exhibit H**.

## Two-Day Requirement to Request Medical Certification Rather than Mandatory

_Horatory_

DOL FMLA regulations provide that, in most cases, an employer should request that an employee furnish certification from a health care provider at the employee's own expense, within two business days after the employer gives notice of the need for leave or within two business days thereafter, or in the case of unforeseen leave, within two business days after the leave commences. LEDS 14108 (d), 29 CFR 825.305(c). The employer in Ayers v. Dolgencorp, Inc., No. 04-413-JAM, 2006 U.S. Dist. waived its right to require medical certification when it failed to request the certification within two business days after the employee requested that the medical certification be required that the employee provide medical certification. The court agreed with other courts which have declined to read the word "should" in 825.305(c)

**Comment:** The two-day requirement applies to Title I, the CAA, and the FECOA. Title II of the FMLA does not place a time limit on an agency request that an employee provide medical certification in support of their FMLA leave request. The issue is addressed in Chapter 9 of _A Federal Sector Guide to the Family and Medical Leave Act_ @ Federal Litigation (Dewey Publications, Inc., 2003 & 2005 Supp.)

A <u>certification</u> from the doctor could be obtain Because I have 5 different vacations. Resume with no restrictions.) But told Denise Ritter I was coming Back to work before I disclied. And was used against me to terminate my Position ADA or interview was due. But didn't need to be because I could of returned before Dec 16, 2004

employee was not requesting FMLA leave at all.

The decision is applicable to all non-civil service (Postal, Congressional, & Non-Postal) employees. It is not, however, applicable to civil service employees covered by Title II. Title II does not require that an employer provide specific notice that medical certification is required for FMLA leave. Indeed, under Title II, the employer would likely be found to have provided adequate notice of the medical certification requirement by incorporating the requirement into a handbook or manual. This is because Title II's employer FMLA notice requirements are much less specific than are those covering non-civil service employees.

March 16, 2007 in Employer Notice, Medical Certification | Permalink | Comments (0) | TrackBack (0)

# Ability to Resume Full Duties is Not Required in Return to Work Certification

In *Carpo v. Wartburg Lutheran Home for the Aging*, No. 05 CV 1169 (JG), 2006 U.S. Dist. LEXIS 74856 (E.D.N.Y. Oct. 16, 2006), the employer's policy required that employees returning from FMLA leave provide a doctor's certification that the employee was able to resume *full duties*. On the expiration of 12 weeks of leave, the employee returned with a handwritten doctor's note on a prescription slip reading: "Pt may attempt to return to work on 2/3/04." The employer found the note unacceptable. The employee was subsequently fired. Carpo sued alleging interference with her FMLA right to return to work by her employer's refusal to accept her return to work certification.

The Court found the fitness-for-duty certification was sufficient as a matter of law. DOL regulations provide that the certification "need only be a simple statement of an employee's ability to return to work." 29 CFR 825.310(c). The court rejected the employer's argument that, to be valid, a certification attesting to the fitness for duty of an employee returning from FMLA leave must contain a definitive statement that an employee is able to return to her "full duties." According to the court:

> A simple statement that the employee can return to work, possibly including qualified language and possibly excluding specification of the level of work an employee is capable of, is all that the regulation requires. Accordingly, the present of words like "attempt" and the absence of phrases like "full duties" in Carpo's not is not fatal...

The court observed that a definitive statement that an employee is able to return to her "full duties" is not supported by the plain language of the statue and DOL regulations. The regulations, the court continued, "contemplated the presence of qualified, precatory, or broad language in a valid note," because it provides a procedure to clarify such notes and prohibits the employer from delaying the employee's return to work while such clarification is sought.

The policies behind the FMLA, inadequate job security for employees with serious health conditions that prevent them from working for temporary periods, also supported the courts conclusion. The court explained:

> If accepted, Wartburg's interpretation of 29 CFR 825.310(c) would subvert this purpose. Employers would be permitted to reject a doctor's certification simply the doctor had written, "It is my believe that employee can return to work," or "Employee likely can return to work safely, but should be careful and attentive." In implementing the FMLA, the Secretary of Labor did not intend to make an employee's job security subject to the caprice of the language in a doctor's note, or to empower employers to play "gotcha" when notes fail to include talismanic phrases. To the contrary, it has advanced the Congressional goal of providing job security for those employees who suffer from serious but temporary health conditions by requiring only a "simply statement of the employee's ability to return to work"--and nothing more--from the doctor.

The court also opined that, as written, the note satisfied the more demanding standard advocated by the employer. According to the court, by stating that Carpo "may attempt return to work," the note conveyed the doctor's belief that, as a medical matter, Carpo was able to resume her work. The qualifying language "may attempt" does not intimate that Carpo is incapable of resuming her full duties, the court found. Rather, it conveyed that the doctor was not absolutely certain, but, because it is very likely that she can, it is safe for her to try.

Comment: The decision is interesting as much for what it doesn't say as what it does. The decision enforces a literally reading of 29 CFR 825.310(c) regarding the permissible scope of a fitness for duty inquiry. It does now, however, address the requirement in 29 CFR 825.214(b) that, to be entitled to job restoration from FMLA leave an employee must be able to perform all essential job functions. Carpo's employer, in a sense, included the requirement that an employee be able to perform all essential job functions on their return as part of the return to work fitness-for-duty certification. The court clearly held that the employer interfered with the employee's rights by incorporating this requirement as part of the fitness-for-duty certification. Presumably, at least for this court, an employer must accept the return of an employee based on a simple statement that the employee may return, and then determine after the employee comes back to work whether the employee is able to perform all essential job functions. If not, the employee would not have perfected his or her FMLA right to return to work. Of course, the employee's return might be permitted pursuant to more generous agency policies, the terms of a collective bargaining agreement, or other laws. If so, the employee's rights would be governed by those laws and not the FMLA.

Carpo is a Title I case. It would apply to federal employees covered by Title I, the CAA, and the PEOAA. It does not apply to civil service employees covered by Title II of the FMLA and the OPM implementing regulations. The FMLA return to work rules under Title II are markedly different than are those under Title I. Chapter 13 of *A Federal Sector Guide to the Family and Medical Leave Act & Related Litigation* (Dewey Publications, Inc. 2003 & 2005 Supplement) addresses return to work requirements.

October 23, 2006 in Medical Certification, Return to Work, fitness for duty certification | Permalink | Comments (0) | TrackBack (0)

## Gatewood, Wendy W

| | |
|---|---|
| **From:** | Holz, Christine [HolzC@aetna.com] |
| **Sent:** | Thursday, December 02, 2004 12:31 PM |
| **To:** | Hickey, Kathleen M; Patel, Biren J; Rebar, Linda |
| **Cc:** | Muller, Lauren E; Fedgo, Karen; Ford, Georgia C; Gatewood, Wendy W; Patel, Biren J; Reilly, Irene M; Wiley, Sharon L |
| **Subject:** | RE: Disability absence of Trista Brown, emp ID #084969 (CHI) |
| **Importance:** | High |

Hi Everyone,

Linda Rebar, RN is reviewing this claim for recertification.     I have
forwarded this email to her attention.

Best of luck Kathleen.

Christine

-----Original Message-----
From: Hickey, Kathleen - QuestDiagnostics
Sent: Thursday, December 02, 2004 1:11 PM
To: Patel, Biren J
Cc: Muller, Lauren - QuestDiagnostics; Fedgo, Karen; Holz, Christine;
Ford, Georgia C; Gatewood, Wendy W; Patel, Biren J; Reilly, Irene M;
Wiley, Sharon L
Subject: RE: Disability absence of Trista Brown, emp ID #084969 (CHI)
Importance: High

No, Biren. Her claim is certified through Tuesday, 12/7 and I'm still
waiting for Aetna's recertification, if necessary.  As soon as we know,
we'll let you know.  Going forward, please contact Lauren Muller as
she's been assigned to handle this case as my last day with Quest
Diagnostics is tomorrow, 12/3.

Karen/Christine (Aetna): On 11/19, Christine advised that this case was
in the process of getting reassigned to a NCM for further handling and
likely recertification.  Can you please tell me who's handling this
case?  We need to know about the recertification as soon as possible as
her FMLA expires on Tuesday, 12/7 and, if the claim gets recertified,
her position will need to be replaced.  Lauren will need to perform an
ADA review for this as well.

Thanks,

Kathy

-----Original Message-----
From: Patel, Biren J
Sent: Thursday, December 02, 2004 12:57 PM
To: Hickey, Kathleen M
Subject: RE: Disability absence of Trista Brown, emp ID #084969 (CHI)

Hi Kathleen,
Do you have any updates on her?
Thanks.

-----Original Message-----

1

From: Hickey, Kathleen M
Sent: Friday, November 19, 2004 10:07 AM
To: Gatewood, Wendy W
Cc: Patel, Biren J; Ford, Georgia C; Patton, Denise C
Subject: FW: Disability absence of Trista Brown, emp ID #084969 (CHI)


Wendy,

As you can see, looks like she's getting recertified beyond 12/7.  As
soon as Aetna confirms this with the physician, I will call Trista and
begin the ADA review.  Let me know if you have any other concerns.

Thanks!

Kathy

-----Original Message-----
From: Holz, Christina [mailto:HolzC@aetna.com]
Sent: Friday, November 19, 2004 10:58 AM
To: Hickey, Kathleen M; Fedgo, Karen
Cc: Patton, Denise C; Ford, Georgia C; Gatewood, Wendy W; Patel, Biren
J; Reilly, Irene M; Wiley, Sharon L
Subject: RE: Disability absence of Trista Brown, emp ID #084969 (CHI)


Hi Kathy,

Thanks for the note. I put a call in to the physician this morning..and
hope to have an answer for ya shortly.  More than likely there will be a
recertification and this claim will go to a nurse in our office for
review.

As of now the return to work date is unknown.

Enjoy your day!

Christine

-----Original Message-----
From: Hickey, Kathleen - QuestDiagnostics
Sent: Friday, November 19, 2004 10:27 AM
To: Holz, Christine; Fedgo, Karen
Cc: Patton, Denise C; Ford, Georgia C; Gatewood, Wendy W; Patel, Biren
J; Reilly, Irene M; Wiley, Sharon L
Subject: FW: Disability absence of Trista Brown, emp ID #084969 (CHI)
Importance: High


Christine/Karen (Aetna),

As requested below, can you tell me if it is likely that Trista will
recover in time to return to work on or before 12/7?  If not, we need to
determine if Trista's position can be replaced due to a significant
business need to do so.

Kindly let me know as soon as possible.

Thank you,

Kathy

> -----Original Message-----
> From:    Gatewood, Wendy W
> Sent:    Thursday, November 18, 2004 4:32 PM
> To: Hickey, Kathleen M
> Cc: Larson, Sara A

                                                          2

> Subject:  RE: Disability absence of Trista Brown, emp ID #084969
(CHI)
>
> what are the chances that she will be back that day - are the
> expectations that she will be recertified? If so, can we do ADA right
>
> away, we want to replace ASAP.
>
> thanks
>
> -----Original Message-----
> From:    Hickey, Kathleen M
> Sent:    Friday, November 05, 2004 9:52 AM
> To: Patton, Denise C
> Cc: Ford, Georgia C; Gatewood, Wendy W; Patel, Biren J; Reilly,
> Irene M; Wiley, Sharon L
> Subject:  FW: Disability absence of Trista Brown, emp ID #084969
(CHI)
>
> Please be advised that Aetna has certified Trista's claim through
> 11/28.  I will keep you posted on her return to work release.
>
> Thanks.
>
> Kathy
> -----Original Message-----
> From:    Hickey, Kathleen M
> Sent:    Thursday, October 14, 2004 11:33 AM
> To: Patton, Denise C
> Cc: Ford, Georgia C; Gatewood, Wendy W; Patel, Biren J; Reilly,
> Irene M; Wiley, Sharon L
> Subject: Disability absence of Trista Brown, emp ID #084969 (CHI)
>
> Trista contacted us to process her disability claim for her absence
> that will begin on 10/28.  The absence is tentatively approved,
> pending certification from Aetna.  At that time, I will keep you
> updated on her disability certification and return to work release.  A
>
> copy of the FMLA Designation letter is attached for your reference.
>
> If you should have any further questions, please contact me.
>
> Thank you,
>
>
> Kathleen M. Hickey
> Benefits Specialist
> Health & Disability Services
> Quest Diagnostics, Inc.
> 1290 Wall Street West
> Lyndhurst, N.J. 07071
> (201) 729-8569 - direct
> (877) 718-4030 x8569 - toll free
> (201) 729-8901 - f
> Kathleen.M.Hickey@QuestDiagnostics.com
>
> << File: Brown, Trista.doc >>

The contents of this message, together with any attachments, are
intended only for the use of the person(s) to which they are addressed
and may contain confidential and/or privileged information. Further, any
medical information herein is confidential and protected by law. It is
unlawful for unauthorized persons to use, review, copy, disclose, or
disseminate confidential medical information. If you are not the
intended recipient. immediately advise the sender and delete this

3

message and any attachments. Any distribution, or copying of this
message, or any attachment, is prohibited.
==================================================================
======

--------------------------------------------------
This e-mail may contain confidential or privileged information. If you
think you have received this e-mail in error, please advise the sender
by reply e-mail and then delete this e-mail immediately. Thank you.
Aetna


==================================================================
======
The contents of this message, together with any attachments, are
intended only for the use of the person(s) to which they are addressed
and may contain confidential and/or privileged information. Further, any
medical information herein is confidential and protected by law. It is
unlawful for unauthorized persons to use, review, copy, disclose, or
disseminate confidential medical information. If you are not the
intended recipient, immediately advise the sender and delete this
message and any attachments. Any distribution, or copying of this
message, or any attachment, is prohibited.
==================================================================
======

--------------------------------------------------
This e-mail may contain confidential or privileged information. If you
think you have received this e-mail in error, please advise the sender by
reply e-mail and then delete this e-mail immediately. Thank you.  Aetna

4

016 2007 CV-006952   8/14/07 001 ============== ATTORNEY ==============
                                        PRO SE
STA BROWN   (H6)
  -VS-
QUEST DIAGNOSTICS

============ DESCRIPTION ============= ========= ATTEMPTED SERVICES ==========
SUBPOENA                                    DATE       TIME      BADGE #

EXPIRES:   8/24/07  FEES:    47.00 FP

SERVED:    8/16/07  07:05 AM    984

RETURNED:  8/16/07 DS  EV/DEP:    0.00

======== PERSON TO BE SERVED ========== NOTES:
VEENA SHARMA
204 WESTWOOD COURT
SHOREWOOD, IL 60404

PERSONAL SERVICE    SERVED ON.. VEENA SHARMA        SEX F RACE W AGE 55 REL N

                    RELEASED BY                     DATE

POSTED:                                             MAILED:

=============================== R E M A R K S ===============================

PF1=NEXT  PF2=BROWSE                                 PF9=MENU  PF10=EXIT

August 18, 2007

To: The United States District Court
Case #: 07CV952

This is in regards to the case involving Trista Brown against Quest Diagnostics. I received a subpoena for this case, and I have absolutely no knowledge or involvement with this case.

I will be traveling abroad from August 24, 2008 and will not be in the United States for a month following. I will not be able to attend the meeting scheduled on August 24th as I will be out of the country.

Sincerely,

Veena Sharma



8 - 17-07

NOTARY PUBLIC
OFFICIAL
SEAL
STATE OF ILLINOIS
L. ANN MARTIN
MY COMMISSION EXPIRES
APRIL 17, 2010